**United States District Court**
**Northern District of California**

GS Labs, LLC,                                    §
                                                 §
   *Plaintiff,*                   §
                                                 §
   v.                              §    Case No. _____
                                                 §
Cigna Health and Life Insurance§
Company, Cigna General Life Insur-§
ance Company, Workday, Inc. Health§
and Welfare Benefits Plan, Visa,§
Inc. Welfare Benefits and Cafete-§
ria Plan, Nvidia Welfare Plan, Elec-§
tronic Arts Benefit Plan, Oportun§
Health & Welfare Benefits Plan,§
and Databricks, Inc. Health and§
Welfare,                                         §
                                                 §
   *Defendants.*                  §

## ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff GS Labs, LLC ("GSL") complains of Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company (collectively, "Cigna"), and Workday, Inc. Health and Welfare Benefits Plan, Visa, Inc. Welfare Benefits and Cafeteria Plan, Nvidia Welfare Plan, Electronic Arts Benefit Plan, Oportun Health & Welfare Benefits Plan, and Databricks, Inc. Health and Welfare (collectively, the "Cigna ASO Plans"). For cause of action, GSL shows as follows.

## NATURE OF CLAIMS

1.    GSL brings this action against Defendants because they have unjustifiably engaged in fraudulent conduct during the COVID-19 public health emergency period in order to evade and circumvent their obligations to provide full coverage and proper reimbursement to GSL for all medically appropriate COVID-19 diagnostic

testing ("Covid Testing") services performed by GSL on members of health plans either insured or administered by Cigna (the "Cigna Members") and billed to such health plans either insured or administered by Cigna (the "Cigna Health Plans").

2.    During the COVID-19 public health emergency, Cigna, in its capacity as both an insurance carrier *and* third-party claims administrator ("TPA") of self-funded health plans, was required to provide coverage for all medically appropriate Covid Testing services received by Cigna Members in accordance with Section 6001 of the Families First Coronavirus Response Act ("FFCRA"), regardless of whether such Covid Testing services were performed by an in-network ("INN") provider or out-of-network ("OON") provider.  When the services were performed by an OON provider, like GS Labs, Defendants were required to reimburse the provider its publicized cash price or a negotiated rate agreed to between the OON provider and Cigna in accordance with Section 3202(a) of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES" Act).  Cigna failed to negotiate an agreed rate with GSL.

3.    Due to the urgent need to facilitate the nation's response to the public health emergency posed by COVID-19, Congress passed both the FFCRA and the CARES Act.  Among other things, these statutes: (i) address issues pertaining to the coverage and reimbursement of Covid Testing services to ensure no person was left financially responsible for Covid Testing for diagnostic purposes; and (ii) drastically expand access to Covid Testing services for the duration of the COVID-19 public health emergency.

4.    Critically, all health plans subject to Section 6001 of the FFCRA were amended—by operation of law under Section 6001 of the FFCRA and Sections 3201-3202 of the CARES Act—to require coverage of all *medically appropriate* diagnostic Covid Testing and to reimburse OON providers of Covid Testing at the full publicly posted cash price.

5.    Yet despite the Congressional mandates placed on insurance carriers and TPAs of self-funded health plans, Defendants' fraudulent conduct has undermined the extraordinary national efforts taken by private stakeholders (*e.g.* GSL) in mitigating the spread of the COVID-19 virus during the public health emergency.  This has all but insured that private stakeholders who have fallen victim to Defendants' schemes (*e.g.* GSL) will think twice before answering Congress's next call to action, in turn jeopardizing any future pandemic responses.

6.    GSL has not only repeatedly asked Cigna about its conduct and schemes intended to circumvent its obligations under the FFCRA and CARES Act, but GSL has also persistently tried to negotiate reimbursement rates for wrongfully denied and underpaid Covid Testing services. Cigna has remained silent and acted in bad faith despite GSL's numerous inquiries. Cigna has also failed to defend or justify its unlawful denials and underpayments for Covid Testing services, thus creating a presumption that the conduct and schemes engaged in by Cigna are in fact fraudulent.

7.    Cigna's motivation for denying and underpaying thousands of GSL's Covid Testing claims (and likely millions of claims by similarly situated OON providers) is simply to profit off the vulnerabilities faced by GSL and other providers, Cigna

Members, and Cigna ASO Plans caused by the public health emergency. Cigna not only profits with each claim it denies or underpays, but it found ways to further profit off these denials and underpayments by manufacturing purported "savings" and/or "recoveries" for its Cigna ASO Plans and taking and embezzling and/or converting a percentage of the manufactured "savings" or "recoveries" to pay itself from the Cigna ASO Plans' trust assets via the "Repricing Reduction Scheme" and the "Overpayment Recovery Scheme," both of which are detailed below.

8.     By way of this lawsuit, GSL seeks to: (i) hold Cigna accountable for the fraudulent and unlawful practices engaged in during the public health emergency (and likely beyond that timeframe); (ii) remedy the damage caused to GSL by Cigna by and through the various and related schemes engaged in by Cigna to circumvent the obligations placed upon it by Congress; and (iii) act as a safeguard against future unlawful practices by Cigna and other health insurance carriers and TPAs in the event of future pandemics and public health emergencies.

9.     GS Labs is a CLIA-certified high-complexity laboratory that operated specimen-collection sites and CLIA-waived Covid Testing sites across the United States. GS Labs fell victim to Cigna's multiple schemes to defraud GSL through the unlawful denial and underpayment of Covid Testing claims and the embezzlement and/or conversion of Cigna ASO Plan assets that should have otherwise been paid to GSL.

10.    Cigna provides health insurance and/or benefits to Cigna Members pursuant to a variety of health benefit plans and policies of insurance, including

employer-sponsored benefit plans and individual health benefit plans (*i.e.*, the Cigna Health Plans).

11.    Cigna also serves in the trusted role of TPA for self-funded health plans, including its Cigna ASO Plans.

12.    Ordinarily, many of the health plans insured or administered by Cigna do not offer their members access to OON providers and facilities—and when they do, they impose different cost-share obligations on OON services than they impose on INN services. But Section 6001 of the FFCRA (as amended by Section 3201 of the CARES Act) requires all group health plans and health insurance issuers offering group or individual health insurance coverage to provide benefits for certain items related to diagnostic testing for the detection or diagnosis of COVID-19 without imposing cost-sharing, prior authorization, or other medical management requirements when such items or services are furnished on or after March 18, 2020, for the duration of the COVID-19 public health emergency—regardless of whether the Covid Testing provider was an INN or OON provider.[1]

13.    Furthermore, Section 3202(a) of the CARES Act requires that all group health plans and health insurance issuers covering Covid Testing items and services (as described in Section 6001 of the FFCRA) must either (i) reimburse OON providers in an amount that equals the cash price for such Covid Testing services as listed by the OON provider on its public internet website or (ii) negotiate a rate/amount to be paid that is less than the publicized cash price.

---

[1] *See* CMS FAQ Parts 42, 43, and 44, The FFCRA and the CARES Act.

14.    Cigna has intentionally disregarded its obligations to comply with its requirements to cover Covid Testing services without imposing cost-sharing and other medical management requirements pursuant to Section 6001 of the FFCRA.  Likewise, when GSL has been reimbursed for its Covid Testing services, Cigna has failed to reimburse GSL in accordance with Section 3202(a) of the CARES Act while still attempting to recover any paid amounts through its "Overpayment" Recovery Scheme (detailed below). These violations are made to financially benefit Cigna and Cigna's co-conspirators—and because Cigna has acted in its own self-interests, its violations have also caused the Cigna ASO Plans to be in violation of the FFCRA and the CARES Act. Moreover, Cigna has caused itself and the Cigna ASO Plans to also be in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), the Patient Protection and Affordable Care Act (the "ACA"), and the terms of each respective Cigna Health Plan regardless of whether the Cigna Health Plan was insured or administered by Cigna because in passing the FFCRA and the CARES Act, Congress amended ERISA, the ACA, and all private health plans to include these statutory coverage and reimbursement requirements.

15.    Cigna has set up complex schemes: (i) to deny or underpay Covid Testing service claims for arbitrary reasons; (ii) to force GSL (and other similarly situated OON providers) into a paperwork war of attrition in hopes of wearing down GSL to the point of collapse by overwhelming GSL's financial and operational resources; (iii) that have turned Cigna's internal administrative appeals process into a kangaroo court where facts and law have no relevance, thus rendering the administrative

appeals process functionally spurious; (iv) to misinform GSL and other OON providers, Cigna Members, the Cigna ASO Plans, the general public, and Federal and State regulators by providing conflicting and contradictory information pertaining to its obligations to properly cover and reimburse Covid Testing services in accordance with the FFCRA and the CARES; (v) to reconstitute *any* payments made to GSL as an "overpayment" in order to further profit from the recovery of the recaptured payments; (vi) to manufacture "savings" through sham, nonexistent, and manufactured contracted rates, fee agreements, or third-party repricing agreements and to profit from the manufactured "savings" created by these sham fee agreements; (vii) to embezzle or convert Cigna ASO Plan assets/funds for its own benefit that GSL was entitled to; and (viii) to ultimately engage in fraudulent conduct for its own financial benefit during the public health emergency.

16.    Cigna's schemes and misconduct violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"). Cigna has engaged in a patten of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) that includes, but may not be limited to, the embezzlement or conversion of welfare funds and the repeated and continuous use of mails and wires in the furtherance of at least nine distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

17.    Additionally, for the Cigna ASO Plans subject to ERISA, Cigna's pattern of racketeering activity also includes Cigna's multiple acts of embezzlement, theft,

and unlawful conversion or abstraction of assets of the Cigna ASO Plans, in violation of 18 U.S.C. § 664.

18.    The following is a list and brief descriptions of each scheme instituted by Cigna meant to circumvent the obligations placed upon it by Congress during the COVID-19 public health emergency and to defraud GSL (these schemes are described more fully in the Factual Allegations below):

19.    ***Scheme 1, Public Misinformation Campaign Scheme:*** Cigna made available and disseminated guidance materials and statements to providers (*e.g.* GSL), Cigna Members, Cigna ASO Plans, federal and state regulators, and the general public that it will comply with the its obligations under the FFCRA, the CARES Act, and other applicable laws to both cover medically appropriate Covid Testing services performed by OON providers and to reimburse OON providers either their cash prices or an agreed upon rate. However, despite its campaign to create an illusion to all stakeholders that Cigna has complied with all applicable laws during the public health emergency, Cigna's practices and actions described in each of these various schemes conflict with the messaging of this Public Misinformation Scheme. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

20.    ***Scheme 2, Conflicting Internal Policies Scheme:*** Despite Cigna's messaging to all stakeholders under Cigna's Public Misinformation Campaign Scheme, the internal policies, scripts, talking points, etc. regarding the coverage and reimbursement of Covid Testing services disseminated to its employees,

representatives, agents, and providers directly contradict and conflict with the Congressional mandates with which Cigna has purported to comply. Moreover, not only do Cigna's own internal policies contradict applicable law, but although these policies explicitly state that applicable federal and state laws supersede Cigna's policies, Cigna's random and inconsistent adjudication of Covid Testing claims does not even align with Cigna's own internal policies. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

21.    ***Scheme 3, Contradictory Adjustment Code Scheme:*** Again, despite Cigna's messaging to all stakeholders under the Public Misinformation Campaign Scheme, Cigna has adjudicated Covid Testing claims in many ways that conflict with the FFCRA and CARES Act messaging under its Public Misinformation Campaign Scheme. Additionally, the adjustment and reason codes utilized by Cigna even contradict the Covid Testing coverage and reimbursement policies that Cigna itself has created and circulated internally and to providers. These contradictions are evidenced by the adjustment and reason codes Cigna gave in its thousands of adverse benefit determinations of GSL's Covid Testing claims. The adjustment and reason codes utilized by Cigna are listed and explained in detail in this Complaint. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

22.    ***Scheme 4, Contradictory Explanation of Benefits (EOB) Scheme:*** Cigna issues false and inconsistent Electronic Remittance Advices (the "Provider ERAs") or Explanations of Payments (the "Provider EOPs") to OON providers like

GSL. These Provider ERAs and Provider EOPs state that the amount not allowed and paid by Cigna for Covid Testing services are not covered under Cigna's health plans or other policies. Meanwhile, Cigna provides completely different information to Cigna Members in the Members' Explanation of Benefits (the "Member EOBs"). Rather than use the same adverse benefit determination adjustment/reasons given to GSL in the Provider ERAs or the Provider EOPs, Cigna misrepresents to the Cigna Member that the difference between the Allowed Amount and the Billed Amount was negotiated down by Cigna or a Cigna contractor (*e.g.* Repricing Company) as a discount to be applied to the claim. But GSL did not negotiate any amounts with Cigna or with Cigna contractors to discount claims on a claim-by-claim basis. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

23.    ***Scheme 5, Repricing Reduction Scheme:*** Cigna has conspired with the Repricing Companies to significantly reduce the reimbursement rates owed and paid to GSL and other similarly situated OON providers. These reduced rates are well below the actual amounts OON providers are legally owed under the Cigna ASO Plans, as amended by the FFCRA and the CARES Act. Cigna sends OON claims (in this case, OON Covid Testing claims) to the Repricing Companies. Cigna then adopts the significantly reduced rate recommended by the Repricing Companies. These recommended rates are intentionally below the amounts that the Cigna ASO Plans are legally required to pay GSL and other OON providers (and in this case, the amounts owed to OON providers under the CARES Act). Cigna, through its other various but

related schemes, goes on to misrepresent to its Cigna Members and the Cigna ASO Plans that Cigna, through its Repricing Companies, has successfully created a "savings" for the Cigna Members and the Cigna ASO Plans. However, Cigna uses these misrepresentations as cover for its embezzlement or conversion of Cigna ASO Plan trust assets, under the guise of cost-containment fees based on a percentage of the "savings" that it manufactured. Cigna then pays itself a percentage of the "savings" it manufactured for itself and also pays a commission to the Repricing Companies. This commission is similarly based on a percentage of "savings." Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

24. ***Scheme 6, Balance Billing Scheme:*** In response to the public health emergency, Congress passed the FFCRA and the CARES Act. Among other things, these statutes ensure that no out-of-pocket costs for medically appropriate Covid Testing services are shifted to any individual. Yet throughout the course of the public health emergency, Cigna has shifted (and continues to shift) financial responsibility to Cigna Members for the difference in the amounts it paid to OON providers and the amounts it should have paid to OON providers on behalf of Cigna Members (the "Balance Bill"). Cigna then informs GSL to bill and collect the Balance Bill from Cigna Members contrary to guidance issued by federal agencies. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

25. ***Scheme 7, Patient Cost-Share Scheme:*** Much like the Balance Billing Scheme, Congress strictly prohibited (through the FFCRA and the CARES Act)

private health insurance plans subject to Section 6001 of the FFCRA, as amended, from shifting any patient cost-share obligations (*i.e.* copay, deductible, coinsurance) to insured persons. However, Cigna, in the adjudication of the claims, has consistently shifted cost-share obligations to Cigna Members; and in its communications to GSL, Cigna informs GSL to bill and collect the patient cost-share obligations from Cigna Members contrary to guidance issued by federal agencies regarding the passing, interpretation, and implementation of the FFCRA and the CARES Act. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

26.    ***Scheme 8, Sham Internal Administrative Appeals Scheme:*** On top of Cigna's unlawful adjudication of Covid Testing claims, Cigna operates and administers an internal administrative appeals process void of any merit. For all health plans subject to Section 6001 of the FFCRA, as amended, Cigna is obligated to comply with the ACA's claims and appeals procedures prescribed in 45 CFR § 147.136. And for all private health plans also subject to ERISA, Cigna must comply with ERISA's claims and appeals procedures prescribed in 29 CFR § 2560.503-1. The purpose of complying with the ACA and ERISA appeal requirements is to ensure that health plans are administering an appeals process that functions in the best interests of its members and not in the best (financial) interests of the administrator, and to ensure that all appealed claims are subject to a full and fair review. GSL has appealed thousands of Cigna's adverse benefit determinations, but Cigna: (i) fails to take into consideration applicable laws that both Cigna and the Covid Testing claims are subject

to; (ii) provides appeals responses that are just as inconsistent and inapplicable as the adjustment and reason codes used when initially adjudicating a claim; and (iii) conflicts, contradicts, and/or undermines all applicable laws (the FFCRA, the CARES Act, ERISA, the ACA, etc.), its public statements feigning compliance with all applicable laws, the terms of the Cigna Health Plans (including the Cigna ASO Plans), and its own internal policies. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

27. ***Scheme 9, Overpayment Recovery Scheme:*** Cigna has conspired with Overpayment Recovery Companies to collect amounts paid to GSL for its Covid Testing services regardless of whether the amount paid complied with the reimbursement requirements of Section 3202(a) of the CARES Act. Cigna has not just imposed whatever arbitrary and inconsistent rate it decides to pay GSL on each of its Covid Testing claims, but even after payment, Cigna and the Overpayment Recovery Companies reconstitute these payments as "overpayments" under fraudulent pretenses and take significant efforts to pressure and coerce GSL to repay Cigna these "overpayments" under the threat of civil litigation and/or other escalatory language. Cigna uses these misrepresentations as cover for its embezzlement or conversion of Cigna ASO Plan trust assets, under the guise of overpayment recovery fees based on a percentage of the "overpaid" amount that it manufactured and unjustly took back from GSL. Cigna has already placed a significant burden on GSL through these various and interrelated schemes, but even when GSL is paid or underpaid for its services, GSL remains vulnerable as these funds are being taken back by Cigna (or attempted/threatened to

be taken back by Cigna); this shifts and places all of the financial risk of performing Covid Testing services on GSL. Additionally, for all amounts recovered by Cigna and the Overpayment Recovery Companies, Cigna pays itself a percentage of the "over-payments" it manufactured for itself. It then pays a commission to the Overpayment Recovery Companies that is similarly based on a percentage of "overpaid" amounts. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

28.    Through these interrelated schemes, Cigna improperly deprives GSL of monies otherwise due and payable to GSL under the Cigna Health Plans, including the Cigna ASO Plans.

29.    In carrying out these schemes, and through other conduct detailed below, Cigna has not only engaged in predicate acts of mail and wire fraud in violation of 18 U.S.C §§ 1341 and 1343, but it has also engaged in multiple acts of embezzlement, theft, or unlawful conversion or abstraction of assets belonging to the Cigna ASO Plans that are subject to ERISA, in violation of 18 U.S.C. § 664.

30.    The foregoing conduct violates RICO in that Cigna has: (i) conducted and participated in the affairs of multiple enterprises, including the Cigna ASO Plans for which Cigna serves as the TPA or otherwise as a Plan fiduciary, through the afore-mentioned patterns of racketeering in violation of 18 U.S.C. § 1962(c); (ii) conspired with the Repricing Companies, Overpayment Recovery Companies, and others, in vi-olation of 18 U.S.C. § 1962(d); (iii) invested the proceeds of the racketeering activities of multiple enterprises – including Cigna itself, the Repricing Companies, and the

Overpayment Recovery Companies – in violation of 18 U.S.C. § 1962(a); and (iv) conspired with the Repricing Companies, the Overpayment Recovery Companies, and others, in violation of 18 U.S.C. § 1962(d).

31.    GSL has been injured in its business and property and thus has standing to pursue a civil RICO action against Cigna under 18 U.S.C. § 1964(c).[2]

## PARTIES

32.    GSL is a limited liability company organized under the laws of the State of Nebraska, with its principal place of business located at 222 S. 15th Street, Suite 1404S, Omaha, Nebraska 68102. As detailed further below, GSL has lawful standing to bring all claims asserted herein.

33.    Defendant Cigna Health and Life Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 900 Cottage Grove Road, Wilde Building, Bloomfield, CT 06152, and its registered agent located at CT Corporation System, One Corporate Center, Hartford, CT 06103-3220. Cigna Health and Life Insurance Company is licensed to conduct the business of insurance in the State of California.

34.    Defendant Connecticut General Life Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of

---

[2] GS Labs contends that Cigna owes it tens of millions of dollars' worth of reimbursements for at least 77,892 patient encounters. The claims at issue were either unpaid or underpaid. A significant number of the claims and dollar amounts at issue involve members or beneficiaries of the Cigna ASO Plans. The rest of the claims involve other health plans. A complete claims spreadsheet with patient name, date of service, CPT codes, billed charges, paid amount, owed amount, etc. has already been provided to Cigna and can be provided to the Cigna ASO Plans or the Court upon request.

business at 900 Cottage Grove Road, Wilde Building, Bloomfield, CT 06152, and its registered agent located at CT Corporation System, One Corporate Center, Hartford, CT 06103-3220. Connecticut General Life Insurance Company is licensed to conduct the business of insurance in the State of California.

35.　Cigna is in the business of underwriting, selling, and administering health benefit plans and policies of health insurance in the State of California and across the country. According to Cigna, it provides benefits under a variety of health benefit plans, including individual health benefit plans and group plans, including employer-sponsored plans or administrative services only plans in the State of California and across the country.

36.　Workday, Inc. Health and Welfare Benefits Plan is an employee health plan sponsored by Workday, Inc.  Workday, Inc. is a Delaware corporation with its principal place of business in Pleasanton, California.  It may be served via its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

37.　Visa, Inc. Welfare Benefits and Cafeteria Plan is an employee health plan sponsored by Visa, Inc.  Visa, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  It may be served via its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

38.　Nvidia Welfare Plan is an employee health plan sponsored by Nvidia, Inc. Nvidia, Inc. is a Delaware corporation with its principal place of business in Santa

Clara, California.  It may be served via its registered agent for service of process, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

39.   Electronic Arts Benefit Plan is an employee health plan sponsored by Electronic Arts, Inc.  Electronic Arts, Inc. is a California corporation with its principal place of business in Redwood City, California.  It may be served via its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

40.   Oportun Health & Welfare Benefits Plan is an employee health plan sponsored by Oportun Financial Corporation.  Oportun Financial Corporation is a Delaware corporation with its principal place of business in San Carlos, California. It may be served via its registered agent for service of process, Incorporating Services Ltd., 3500 South Dupont Highway, Dover, DE 19901.

41.   Databricks, Inc. Health and Welfare is an employee health plan sponsored by Databricks, Inc.  Databricks, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  It may be served via its chief executive officer, Ali Ghodsi, at 160 Spear Street, 13th Floor, San Francisco, CA 94105.

## JURISDICTION AND VENUE

42.   This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1131, as GSL asserts federal RICO claims against Cigna.  This Court also has federal diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of the parties and the amount in controversy exceeds $38 million, not

including anything for treble or exemplary damages due to Defendants' RICO violations and fraud.

43.   This Court also has supplemental jurisdiction over GSL's state law claims against Cigna because these claims are so related to GSL's federal claims that the state law claims form a part of the same case or controversy under Article III of the United States Constitution. The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

44.   This Court has general personal jurisdiction over all of the Cigna ASO Plans because they each have their principal place of business in California and are thus California residents.  This Court has general personal jurisdiction over Cigna because it is licensed to conduct the business of insurance and third-party claims administration services in California and it actually conducts such business in California.  This Court has specific personal jurisdiction over all Defendants because a substantial portion of GSL's claims arise from Defendants' fraudulent and improper claims processing activities conducted in this state.  Cigna received GSL's claims for reimbursement, Cigna communicated with the plans about GSL's claims in California, Cigna submitted the claims for payment to the Cigna ASO Plans in California, and Defendants decided not to pay or underpaid GSL for its services in California.

45.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this action arose in this District and pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because all of the Cigna ASO Plans reside in this District.

## FACTUAL ALLEGATIONS

### I.  Relevant background regarding the FFCRA and CARES Act

46.    Pursuant to Section 319 of the Public Health Service Act, on January 31, 2020, the Secretary of Health and Human Services ("HHS") issued a determination that a Public Health Emergency exists and has existed as of January 27, 2020, due to confirmed cases of COVID-19 being identified in this country.[3]

47.    On March 13, 2020, the President issued Proclamation 9994 declaring a National Emergency concerning the COVID-19 outbreak with a determination that a national emergency exists nationwide, pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

48.    To facilitate the nation's response to the COVID-19 pandemic, Congress passed the FFCRA and the CARES Act.  Among other things, these statutes require group health plans and health insurance issuers offering group or individual health insurance coverage to: (i) provide benefits for certain items and services related to diagnostic testing for the detection or diagnosis of COVID-19 without the imposition of any cost-sharing requirements (i.e. deductibles, copayments, and coinsurance) or prior authorization or other medical management requirements;[4] and (ii) to reimburse any provider for COVID-19 diagnostic testing an amount that equals the negotiated rate or, if the plan or issuer does not have a negotiated rate with the provider

---

[3] The COVID-19 Public Health Emergency expired on May 11, 2023.

[4] Pub. L. No. 116-127 (2020).

(e.g. GSL), the cash price for such service that is listed by the provider on its public website in accordance with 45 CFR § 182.40.[5]

49.   To further clarify to issuers and health plans their legal expectations when processing a claim for Covid Testing in accordance with the FFCRA and the CARES Act, the Department of Labor ("DOL"), the Department of Health and Human Services ("HHS"), and the Department of the Treasury (the "Treasury") (collectively, the "Departments") jointly prepared and issued a series of Frequently Asked Questions ("FAQs") to address any stakeholder questions or concerns pertaining to the proper adjudication of Covid Testing claims. The following FAQs summarize the health plan and issuers' obligations pertaining to covering and paying for Covid Testing services during the public health emergency:

**The Departments FAQ, Part 42, Q1**: *Which types of group health plans and health insurance coverage are subject to section 6001 of the FFCRA, as amended by section 3201 of the CARES Act?*

Section 6001 of the FFCRA, as amended by section 3201 of the CARES Act, applies to group health plans and health insurance issuers offering group or individual health insurance coverage (including grandfathered health plans as defined in section 1251(e) of the Patient Protection and Affordable Care). The term "group health plan" includes both insured and self-insured group health plans. It includes private employment-based group health plans (ERISA plans), non-federal governmental plans (such as plans sponsored by states and local governments), and church plans.

"Individual health insurance coverage" includes coverage offered in the individual market through or outside of an Exchange, as well as student health insurance coverage (as defined in 45 CFR 147.145).[6]

* * *

---

[5] Pub. L. No. 116-136 (2020).

[6] *See* https://www.cms.gov/files/document/FFCRA-Part-42-FAQs.pdf.

**The Departments FAQ, Part 42, Q3**: *What items and services must plans and issuers provide benefits for under section 6001 of the FFCRA?*

Section 6001(a) of the FFCRA, as amended by Section 3201 of the CARES Act, requires plans and issuers to provide coverage for the following items and services:

(1) An in vitro diagnostic test as defined in section 809.3 of the title 21, Code of Federal Regulations, (or its successor regulations) for the detection of SARS-CoV-2 or the diagnosis of COVID-19, and the administration of such a test, that - …

B. The developer has requested, or intends to request, emergency use authorization under section 564 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bbb-3), unless and until the emergency use authorization request under such section 564 has been denied or the developer of such test does not submit a request under such section within a reasonable timeframe;…[7]

\* \* \*

**The Departments FAQ, Part 42, Q6**: *May a plan or issuer impose any cost-sharing requirements, prior authorization requirements, or other medical management requirements for benefits that must be provided under section 6001(a) of the FFCRA, as amended by section 3201 of the CARES Act?*

No. Section 6001(a) of the FFCRA provides that plans and issuers shall not impose any cost-sharing requirements (including deductibles, copayments, and coinsurance), prior authorization requirements, or other medical management requirements for these items and services. These items and services must be covered without cost sharing when medically appropriate for the individual, as determined by the individual's attending healthcare provider in accordance with accepted standards of current medical practice.[8]

**The Departments FAQ, Part 42, Q7**: *Are plans and issuers required to provide coverage for items and services that are furnished by providers that have not agreed to accept a negotiated rate as payment in full (i.e., out-of-network providers)?*

Yes. Section 3202(a) of the CARES Act provides that a plan or issuer providing coverage of items and services described in section 6001(a) of the FFCRA shall reimburse the provider of the diagnostic testing as follows: …

---

[7] *Id.*

[8] *Id.*

2. If the plan or issuer does not have a negotiated rate with such provider, the plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or the plan or issuer may negotiate a rate with the provider for less than such cash price…[9]

* * *

**The Departments FAQ, Part 43, Q9**: *Does Section 3202 of the CARES Act protect participants, beneficiaries, and enrollees from balance billing for a COVID-19 diagnostic test?*

The Departments read the requirement to provide coverage without cost sharing in section 6001 of the FFCRA, together with section 3202(a) of the CARES Act establishing a process for setting reimbursement rates, as intended to protect participants, beneficiaries, and enrollees from being balance billed for an applicable COVID-19 test. Section 3202(a) contemplates that a provider of COVID-19 testing will be reimbursed either a negotiated rate or an amount that equals the cash price for such service that is listed by the provider on a public website. In either case, the amount the plan or issuer reimburses the provider constitutes payment in full for the test, with no cost sharing to the individual or other balance due. Therefore, the statute generally precludes balance billing for COVID-19 testing. However, section 3202(a) of the CARES Act does not preclude balance billing for items and services not subject to section 3202(a), although balance billing may be prohibited by applicable state law and other applicable contractual agreements.[10]

---

[9] *Id.*

[10] See https://www.cms.gov/files/document/FFCRA-Part-43-FAQs.pdf; *see also* FAQ Part 43 Q12:

> Because the Departments interpret the provisions of section 3202 of the CARES Act as specifying a rate that generally protects participants, beneficiaries, and enrollees from balance billing for a COVID-19 test (see Q9 above), the requirement to pay the greatest of three amounts under the regulations implementing section 2719A of the PHS Act is superseded by the requirements of section 3202(a) of the CARES Act with regard to COVID-19 diagnostic tests that are out-of-network emergency services. For these services, the plan or issuer must reimburse an out-of-network provider of COVID-19 testing an amount that equals the cash price for such service that is listed by the provider on a public website, or the plan or issuer may negotiate a rate that is lower than the cash price.

## II. GSL invested substantial resources to develop a distinct, high-quality COVID testing operation in response to the COVID-19 pandemic.

50.    GSL was formed in January 2020 as a clinical lab in Omaha, Nebraska.

51.    In response to the COVID-19 public health emergency in early 2020, GSL shifted its business model to focus on providing diagnostic Covid Testing to communities in need, quickly investing in and opening over 50 Covid Testing sites across the country.

52.    As a new entrant to the nascent diagnostic testing market, GSL had to make substantial investments to expeditiously develop infrastructure and a team for delivering its testing services entirely from the ground up in response to the fast-spreading pandemic.

53.    Given the unusually high infection rate of COVID-19 and the need for rapid testing to prevent community spread—and in contrast with other testing providers—GSL's founders focused on developing a scalable, capital-intensive, high-quality testing operation that attracts patients by maximizing appointment availability while providing safe, seamless, secure, and accessible drive-through testing administration, and where possible, delivering same-day test-results.

54.    Additionally, to maximize testing capacity, GSL secured staffing to operate its sites up to seven days per week, twelve hours per day.

55.    The distinctly high-quality COVID-19 diagnostic testing operation that GSL developed required the investment of significant capital. GSL invested substantial resources in developing a secure and proprietary intake and results distribution

software technology platform, procuring leases to operate numerous testing locations and space, purchasing high-grade supplies and equipment, and more.

56.   GSL also assembled its own in-house support teams, including staffing and billing personnel, and committed to employing highly credentialed test adminis-trators, predominantly registered nurses ("RNs"), to be present on-site and available to answer patient questions. GSL paid premium wages to recruit, train, and retain high-skilled testing providers to exceed industry standards of care.

57.   Maintaining these outlays required GSL to secure consistent cash flows, and to charge prices that reflect the true cost of its higher-quality services.

58.   As a result of this extensive planning and substantial investments, GSL quickly established the capacity to administer tests to up to 1,000 patients per day at each of its testing sites.

59.   GSL's premium system allowed Patients to book appointments within 15 minutes and to receive test results within as little as 20 minutes, with no compromise to patient safety, security, or test accuracy.

60.   GSL's planning and investments enabled it to test more patients, and provide results more quickly than incumbent testing providers such as retail phar-macies.

61.   GSL's testing capacity was several times greater than other Covid Test-ing providers.  Thus GSL was a key player in the continued public health response to COVID-19 and in saving lives across the country.

### III.  Cigna's multiple RICO violations

### A. Overview

62.    Although Cigna was required to comply with the FFCRA, the CARES Act, ERISA, the ACA, along with the terms of each Cigna Health Plan, Cigna engaged in fraudulent and other unlawful actions to conduct and participate in the affairs of the Cigna Health Plans, including the Cigna ASO Plans. In doing so, Cigna has engaged in multiple violations of RICO, 18 U.S.C. §§ 1961-1968.

63.    Each of the Cigna ASO Plans is an enterprise within the meaning of 18 U.S.C. § 1961(4), in that each has an independent legal existence.

64.    Cigna has conducted or participated in the affairs of these enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5) and conspired with others to do so. In doing so, Cigna has violated 18 U.S.C. §§ 1962(c) and 1962(d).

65.    Moreover, Cigna has invested the proceeds of its racketeering activity into one or more enterprises and conspired with others to do so. In doing so, Cigna has violated 18 U.S.C. §§ 1962(a) and 1962(d).

66.    This pattern of racketeering activity involves Cigna's multiple and repeated use of the mails and wires in furtherance of at least nine distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

67.    The pattern of racketeering activity also involves Cigna's multiple and repeated acts of embezzlement and/or conversion of the Cigna ASO Plans trust assets in violation of 18 U.S.C. § 664.

68.   GSL has been injured in its business and property through Cigna's multiple RICO violations, and thus has standing to bring this action under RICO's civil enforcement provision, 18 U.S.C. § 1964(c).

**B. The RICO Enterprises**

69.   At all relevant times, all of the subject Cigna ASO Plans have been "enterprises," within the meaning of 18 U.S.C. § 1961(4), as each is an independent legal entity distinct from Cigna, and each Cigna ASO Plan subject to ERISA is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1).

70.   At all relevant times, the Cigna ASO Plans have been and continue to be engaged in activities affecting interstate commerce, including, but not limited to, providing health insurance coverage benefits through employer self-funded health benefit plans to employee-members (and dependent-members) across state lines.

71.   The Cigna ASO Plans exist for the legitimate purpose of providing each of their respective plan members with health insurance coverage for medically necessary treatment provided by INN and OON providers under the terms of the Cigna ASO Plans. However, Cigna conspired to conduct or participate in the conduct of the affairs of the Cigna ASO Plans through a separate and distinct "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

**C. Cigna's Pattern of Racketeering Activity**

72.   Since at least 2020 (and likely much earlier) and continuing through the course of the COVID-19 public health emergency and to present, Cigna has conducted and participated in the conduct of the affairs of the Cigna ASO Plans, through a

pattern of racketeering activity within the meaning of 18 U.S.C. 1961(5) and conspired with others to do so.

73.    The pattern of racketeering activity includes multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and embezzlement and/or conversion for Cigna's own use of the Cigna ASO Plans' trust assets in violation of 18 U.S.C. § 664.

74.    Cigna (a) used the mails and wires (b) in the foreseeable furtherance of (c) a scheme or artifice to defraud (d) involving material deceptions (e) with the intent to deprive GSL and other similarly situated OON providers of property.

75.    Cigna's schemes to defraud, predicate acts of mail and wire fraud, and predicate acts of embezzling or converting the Cigna ASO Plans' trust assets in furtherance of these schemes to defraud are described in detail below. Cigna's racketeering acts together have the following features.

### 1.    Relatedness

76.    Cigna's acts of racketeering are not isolated events. Rather, all are related to each other in that they have similar purposes, results, participants, victims, methods of commission, and other distinguishing characteristics. All of the acts were done for the benefit of Cigna and in furtherance of Cigna's agenda.

77.    Cigna's predicate acts of racketeering were and continue to be directed at the same overarching goals of harming GSL financially by deceiving GSL, Cigna Members, and the Cigna ASO Plans.

78.    Cigna has specifically targeted OON providers, including GSL, in pursuit of its profiteering. Cigna's schemes to defraud are aimed at depriving GSL of monies it is owed under applicable law and the terms of the Cigna Health Plans, including the Cigna ASO Plans, amended by applicable law. GSL is the intended and actual victim of each separate act of racketeering described herein.

79.    Cigna has participated in, authorized, and/or ratified the specific acts of mail and wire fraud and embezzlement and conversion alleged herein. Cigna has issued false and misleading transmissions and statements over the mails and wires designed to mislead GSL, the Cigna Members, and the Cigna ASO Plans about their obligations to comply with and/or administer Cigna Health Plans in compliance with the FFCRA and the CARES Act in furtherance of its various schemes. It has also used the mails and wires to create the false impression that Cigna pays what it is legally obligated to pay OON providers for Covid Testing services on behalf of Cigna Members and the Cigna ASO Plans, to the significant financial determinant of GSL.

80.    Cigna and its officers and employees expressly designed and authorized the racketeering acts and participated actively in them.

### 2.    Continuity

81.    Cigna's related racketeering acts have extended from at least 2020 (and likely much earlier) and continued through the course of the COVID-19 public health emergency and to present.

82.    Cigna's related predicate acts also involve a continued thread of long-term racketeering activity.

83.     Upon information and belief, Cigna's schemes to defraud and acts of embezzlement and conversion of Cigna ASO Plan trust assets have generated hundreds of millions of dollars in revenue for itself and the third-party Repricing Companies and the Overpayment Recovery Companies.

84.     The related predicate acts therefore involve a continued threat of long-term racketeering activity. There is no foreseeable ending point to Cigna's acts of racketeering against GSL and other similarly situated OON providers.

85.     In addition, the predicate acts and offenses described herein are Cigna's regular way of doing business and thereby threaten long-term illegal conduct against the public at large.

### D. Cigna Uses the Mails and Wires in Furtherance of Multiple Schemes to Defraud, in Violation of 18 U.S.C. §§ 1341 and 1343.

86.     Through all of Cigna's interrelated schemes to defraud, Cigna deprives GSL of money and property, including money due and owing to GSL under the Cigna Health Plans (including the Cigna ASO Plans), and unnecessary time and administrative expense seeking to obtain payments to which it is already entitled under applicable law, the Cigna Health Plans (including the Cigna ASO Plans).

87.     Cigna, its officers, and agents have used the mails and wires to execute Cigna's schemes to defraud by transmitting material misrepresentations and omissions about its obligations under the FFCRA and the CARES Act to properly cover and reimburse GSL and other similarly situated OON providers of Covid Testing services, while simultaneously profiting off of its intentional violations of these laws. The

time, place, methods, modes, and nature of these misrepresentations are described more fully below.

88.    Cigna's false representations were material in that they were capable of influencing the decisions of those to whom the statements were directed in ways having an adverse financial impact on GSL. At all relevant times, such adverse financial impact was not only foreseeable, but was and is the specifically intended result of Cigna's fraudulent schemes. Cigna intended and intends for the Cigna ASO Plans, Cigna Members, and GSL and other similarly-situated OON providers to act in reliance on Cigna's material misrepresentations and concealments, by accepting that Cigna appropriately covered and reimbursed GSL for the medically appropriate Covid Testing services provided to Cigna Members.

89.    In fact, the Cigna ASO Plans, Cigna Members, and GSL and other OON providers have relied on Cigna's material misrepresentations to the GSL's detriment, precisely as Cigna intended. GSL has lost money and has been forced (and continues to be forced) to expend limited administrative resources seeking to obtain payments to which they are entitled, which is a direct and intended result of Cigna's schemes to defraud.

90.    Cigna acted with the specific intent to deceive and for the purpose of depriving GSL of property. Cigna specifically intended to cause GSL such injury.

91.    All acts of mail and wire fraud alleged herein were ordered by Cigna and performed by persons acting as agents on its behalf. In fact, Cigna's name is on the various HIPAA standard transactions to the Cigna ASO Plans and GSL, as well as

the Explanations of Benefits, Explanations of Payments, Appeal Responses, Overpayment Notices, Internal Policies, and guidance and publications to providers, Cigna ASO Plans, and Cigna Members, that have been used in Cigna's furtherance of its schemes to defraud.

### 1. Public Misinformation Campaign Scheme

92. Immediately upon the declaration of the COVID-19 public health emergency, Congress passed the FFCRA and the CARES Act, which incorporated and amended ERISA, the ACA, and the terms of all private health plans subject to Section 6001 of the FFCRA, as amended. The FFCRA and CARES Act mandated the coverage and proper reimbursement of Covid Testing services to ensure that everyone and anyone in this country could gain access to Covid Testing when needed and would not need to pay for such testing from their own pockets.

93. Cigna latched onto Congress' legislation and publicly campaigned and declared to INN and OON providers, its Cigna members, its Cigna ASO Plans, and all other stakeholders that Cigna fully intends to comply with all requirements of these new emergency laws.

94. Cigna publicized and/or made reference to the FFCRA and the CARES Act across many mediums (*e.g.* websites, FAQs, articles, bulletin board materials, guidance documents, etc.), and its dedication to compliance with these laws to generate goodwill with the public that Cigna is working hand in hand with governments and healthcare providers to respond and address key concerns raised by the COVID-19 pandemic.

95.   In reality, Cigna's Public Misinformation Campaign was nothing more than lip service as its actions undermine and contradict what Cigna publicly told its audience.

96.   Below are examples of statements and representations made by Cigna regarding its compliance with the FFCRA and the CARES in its campaign to misinform OON providers like GSL, Cigna Members, and Cigna ASO Plans, and all other stakeholders:

- **COVID-19 Testing Coverage:** Clarifies existing law requiring all COVID-19 testing to be covered by group health plans and individual market issuers without cost-sharing, including those tests without an emergency use authorization by the Food and Drug Administration (FDA).

    - In early March, Cigna voluntarily announced it would waive cost-sharing for COVID-19 testing and office visits related to testing for our members through May 31.

- **Payment of COVID Tests:** Requires commercial insurers to pay either: (1) the rate specified in a contract between the provider and the insurer in effect before the public health emergency was declared, throughout the duration of the public health emergency; or (2) if there is no contract, a cash price posted on a public website by the provider, or the plan may negotiate a rate lower than the cash price. Imposes civil monetary penalties on providers that do not post the price on a public website. [11]

    - ▼ **Current interim coverage accommodations for commercial Cigna medical services:**
        - The cost-share waiver for COVID-19 diagnostic testing and related office visits is in place until the end of Public Health Emergency (PHE) period, currently through January 15, 2022. [12]

---

[11] *See* https://www.cigna.com/employers/insights/informed-on-reform/news/cares-act-covid-19-relief package#:~:text=On%20March%2027%2C%202020%2C%20President,(CARES)%20Act%20into%20law.

[12]       *See*       https://static.cigna.com/assets/chcp/resourceLibrary/medicalResourcesList/medicalDoingBusinessWithCigna/medicalDbwcCOVID-19.html

> **COVID-19 testing is covered with no copays or cost-shares:** We're waiving copays and cost-shares for COVID-19 FDA-approved testing. Only a health care provider or hospital can administer the test and send the sample to an approved lab for results.

97.    In these public messages, Cigna purports to cover all Covid Testing services without imposing any cost-share obligations, and to pay OON providers their cash price or an agreed upon rate as required by Section 3202(a) of the CARES Act. However, as detailed in the other interrelated schemes, Cigna's actions undermine and conflict with these representations.

98.    On its website and other materials, Cigna consistently makes reference to the FFCRA and the CARES Act, summarizes the purpose and application of these laws, and describes how these laws apply to Cigna. Cigna even goes as far as linking the actual legislation of the FFCRA and the CARES Act to its website and other materials—for example:

The bill can be read in full **here** ☐. [13]

Indeed, the example in the previous paragraph is a hyperlink to the entire CARES Act (Public Law No. 116-136), which mandates that Cigna pay OON providers their cash price or an agreed rate.

99.    In the following campaign messaging, Cigna represents that it covers all Covid Testing services and complies with all applicable requirements, and states that it will administer all Cigna ASO Plans in accordance with such requirements:

---

[13]    https://www.cigna.com/employers/insights/informed-on-reform/news/cares-act-covid-19-relief-package#:~:text=On%20March%2027%2C%202020%2C%20President,(CARES)%20Act%20into%20law. The hyperlink included in this Cigna statements leads to the CARES Act (Public Law No. 116-136) in its entirety; https://www.congress.gov/bill/116th-congress/house-bill/748/text.

> **Q. Does Cigna cover diagnostic laboratory tests for COVID-19?**
>
> Yes. To help remove any barriers to receive testing, Cigna will cover any diagnostic molecular or antigen diagnostic test for COVID-19, including rapid tests and saliva-based tests, through January 15, 2022.
>
> In addition, these requirements must be met:
>
> This guidance applies for all providers, including urgent care centers and emergency rooms, and applies to customers enrolled in Cigna's employer-sponsored plans in the United States and the Individual & Family plans available through the Affordable Care Act. Organizations that offer Administrative Services Only (ASO) plans will be opted in to waiving cost-share for this service as well.

But as evidenced by the schemes detailed later in this Complaint, Cigna's actions contradict these representations.

100.  In another campaign message, Cigna represents that it considers the receipt of each Covid Testing claim as reflecting an "individualized clinical assessment" and the tests will be covered without the imposition of cost-shares, prior authorization, or other medical management requirements:

> **Q: Does Cigna cover testing for asymptomatic individuals?**
>
> Cigna will cover a COVID-19 test for an asymptomatic individual when the individual seeks and receives a diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test. In these cases, Cigna generally assumes that the receipt of these tests reflects an "individualized clinical assessment," and the test will therefore be covered without cost sharing, prior authorization, or other medical management requirements.

Yet despite these claims, Cigna routinely imposes such requirements and consistently denies Covid Testing services even if they have been deemed medically appropriate by attending health care providers using the medical guidance issued by the

Centers for Disease Control (the "CDC") and the Infectious Disease Society of America (the "IDSA"), whose guidance Cigna purports to follow.

101.  Furthermore, Cigna adopts the same language in its messaging that the Departments utilize in their guidance and FAQs concerning FFCRA and the CARES Act.  In other words, Cigna piggybacks off the Departments' guidance and language when disseminating information for its Public Misinformation Campaign.  It then picks and chooses which parts of the FAQs and guidance it will comply with.[14]

102.  In the following messaging, Cigna purports to cover antibody testing used for diagnostic purposes as deemed medically appropriate by an attending healthcare provider:

---

[14] *See* The Departments' FAQs, Part 43, June 23, 2020 (https://www.cms.gov/files/document/ffcra-part-43-faqs.pdf).

**Q3. In FAQs Part 42, the Departments clarified that coverage for certain items and services must be provided consistent with the requirements of section 6001 of the FFCRA "when medically appropriate for the individual, as determined by the individual's attending health care provider." How should plans and issuers determine if a provider is the attending health care provider?**

Given the critical importance of expanding the availability of COVID-19 testing through safe and accurate tests to combat the COVID-19 pandemic, the Departments clarify that a health care provider need not be "directly" responsible for providing care to the patient to be considered an attending provider, as long as the provider makes <u>an individualized clinical assessment to determine whether the test is medically appropriate</u> for the individual in accordance with current accepted standards of medical practice. Therefore, an attending provider for purposes of section 6001 of the FFCRA is an individual who is licensed (or otherwise authorized) under applicable law, who is acting within the scope of the provider's license (or authorization), and who is responsible for providing care to the patient. As stated in FAQs Part 42, a plan, issuer, hospital, or managed care organization is not an attending provider.

> **Q: Does Cigna cover serology tests?**
> A serology (i.e., antibody) test for COVID-19 is considered diagnostic and covered without cost-share through January 15, 2022 when ALL of the following criteria are met:
>
> static.cigna.com/assets/chcp/resourceLibrary/medicalResourcesList/medicalDoingBusiness
>
> ---
>
> 21, 11:02 AM                                              CHCP - Resources - Cigna's re
>
> - An individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider; or
> - A licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test; and
> - The laboratory test is FDA approved or cleared or has received Emergency Use Authorization (EUA); and
> - The test is run in a laboratory, office, urgent care center, emergency room, or other setting with the appropriate CLIA certification (or waiver), as described in the EUA IFU; and
> - The results of a molecular or antigen test are non-diagnostic for COVID-19 and the results of the antibody test will be used to aid in the diagnosis of a condition related to COVID-19 antibodies (e.g., Multisystem Inflammatory Syndrome); and
> - The laboratory or provider bills using the codes in our interim billing guidelines and testing coverage policy.

Yet Cigna consistently denies antibody testing performed on Cigna Members by GSL for various reasons, such as claiming that the testing is not medically necessary or appropriate.

103.  Cigna also made clear in its campaign that all federal and state mandates supersede all plan terms and policies, especially during the public health emergencies:

> - State and federal mandates, as well as customer benefit plan designs, may supersede our guidelines.

In reality, Cigna has elevated its own financial interests over the federal and state mandates that it explicitly represents should be controlling under the circumstances created under the public health emergency.

104. Cigna's Public Misinformation Campaign Scheme is peculiar to say the least. Cigna has overtly declared its dedication to complying with the requirements imposed upon it by the FFCRA and the CARES while it simultaneously (and overtly) contradicting and undermining these same compliance promises.

105. It is likely that Cigna assumed by publicly proclaiming its dedication to compliance with applicable emergency laws that Cigna Members and Cigna ASO Plans would fail to notice the manner in which their Covid Testing claims were actually being adjudicated, further allowing Cigna to implement related schemes to embezzle and convert the Cigna ASO Plans' trust assets.

106. On information and belief, it is likely that Cigna prepared and disseminated a significant number of materials to Cigna Members and Cigna ASO Plans purporting to comply with the FFCRA and the CARES Act, and discovery obtained on this scheme will reveal the lengths to which Cigna has gone to deceive Cigna Members and Cigna ASO Plans into thinking each of their respective health plans were being administered in a lawful manner.

107. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

## 2. Contradictory Internal Policies Scheme

108. The messaging behind Cigna's Public Misinformation Campaign is clear: Proclaim compliance with the FFCRA, the CARES Act, and other controlling guidance as loudly as possible while simultaneously working to undermine and circumvent those same laws and requirements.

109.  Additionally, not only does Cigna issue internal policies, memorandums, talking points and scripts that explicitly contradict the FFCRA, the CARES Act, and its various representations made in its Public Misinformation Scheme, but it has also failed even to follow its own internal policies on adjudicating Covid Testing claims.

110.  Below are examples of statements and/or materials that Cigna has disseminated internally to its staff:

- State and federal mandates, as well as customer benefit plan designs, may supersede our guidelines.

**INSTRUCTIONS FOR USE**
*The following Coverage Policy applies to health benefit plans administered by Cigna Companies. Certain Cigna Companies and/or lines of business only provide utilization review services to clients and do not make coverage determinations. References to standard benefit plan language and coverage determinations do not apply to those clients. Coverage Policies are intended to provide guidance in interpreting certain standard benefit plans administered by Cigna Companies. Please note, the terms of a customer's particular benefit plan document [Group Service Agreement, Evidence of Coverage, Certificate of Coverage, Summary Plan Description (SPD) or similar plan document] may differ significantly from the standard benefit plans upon which these Coverage Policies are based. For example, a customer's benefit plan document may contain a specific exclusion related to a topic addressed in a Coverage Policy. In the event of a conflict, a customer's benefit plan document always supersedes the information in the Coverage Policies. In the absence of a controlling federal or state coverage mandate, benefits are ultimately determined by the terms of the applicable benefit plan document. Coverage determinations in each specific instance require consideration of 1) the terms of the applicable benefit plan document in effect on the date of service; 2) any applicable laws/regulations; 3) any relevant collateral source materials including Coverage Policies; and 4) the specific facts of the particular situation. Each coverage request should be reviewed on its own merits. Medical directors are expected to exercise clinical judgment and have discretion in making individual coverage determinations. Coverage Policies relate exclusively to the administration of health benefit plans. Coverage Policies are not recommendations for treatment and should never be used as treatment guidelines. In certain markets, delegated vendor guidelines may be used to support medical necessity and other coverage determinations.*

111.  First and foremost, these internally circulated statements reflect Cigna's knowledge and understanding that the FFCRA and the CARES Act are controlling law.  Yet Cigna still continues to include—within the same materials—contradictory requirements that Cigna representatives and agents must follow:

This Coverage Policy addresses in vitro diagnostic testing methods to detect the presence of, or suspected exposure to the SARS-CoV-2 virus which causes COVID-19 infection. Molecular tests and antigen tests are considered diagnostic of an active infection with the SARS-CoV-2 virus. In general, serology (antibody) tests are not diagnostic; rather, they are used to identify individuals who have developed antibodies against the SARS-CoV-2 virus and may be used for public health purposes such as population prevalence estimates. The Coverage Policy applies to both individual and pooled testing methods.

> **An antibody (serology) test for SARS-CoV-2 antibodies is considered diagnostic and is a covered service with no customer cost share during the declared Public Health Emergency (PHE) period when ALL of the following criteria are met:**
>
> - an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, **OR** a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test
> - FDA approved or cleared or Emergency Use Authorization (EUA)
> - performed by a CLIA-accredited high or medium-complexity laboratory (per test Instructions for Use)
> - results of a molecular or antigen test is non diagnostic for COVID-19 and the results of the test will be used to aid in the diagnosis of a condition related to COVID-19 infection (e.g., Multisystem Inflammatory Syndrome [MIS]).

In these examples, Cigna states that COVID-19 antibody testing is both diagnostic *and not diagnostic.* Not only do these statements contradict each other, but the former statement contradicts the Departments' guidance stating that antibody testing *is diagnostic* when deemed medically appropriate by an attending healthcare provider.

112. Additionally, although Cigna states (sometimes) that COVID-19 antibody testing during the public health emergency *is* diagnostic, Cigna has denied thousands of antibody tests billed by GSL to Cigna in conflict with this policy.

113. In the following examples, Cigna states that the practice of confirmatory testing is medically appropriate and should be covered by Cigna:

> The CDC also notes:
>
> - Molecular or antigen tests are recommended to diagnose acute infection.
> - Persons with signs or symptoms of COVID-19 should have diagnostic testing.
> - Point-of-care serial screening can provide rapid results and be critical to identifying asymptomatic cases needed to interrupt SARS-CoV-2 transmission. This is especially important when community risk or transmission levels are substantial or high.
> - The selection and interpretation of SARS-CoV-2 tests should be based on the context in which they are being used, including the prevalence of SARS-CoV-2 in the population being tested.
> - Vaccination status should not affect the results of viral testing for SARS-CoV-2. Testing for SARS-CoV-2 should be conducted in consultation with a healthcare provider
> - A negative antigen test in persons with signs or symptoms of COVID-19 should be confirmed by NAAT, a more sensitive test.
> - In instances of higher pretest probability, such as high incidence of infection in the community, or a person with household or continuous contact to a person with COVID-19, clinical judgement should determine if a positive antigen result for an asymptomatic person should be followed by a laboratory-based confirmatory NAAT.

Regarding antigen tests, the CDC (2022) notes the following:

- In a symptomatic individual, infection with SARS-CoV-2 can be identified by the presence of a positive antigen test.
- A negative antigen test result for a symptomatic person should be confirmed with an FDA-authorized NAAT. CDC recommends using a NAAT that has been evaluated against the FDA reference panel for analytical sensitivity. If the person has a low likelihood of SARS-CoV-2 infection (e.g., no known

Page 10 of 24
Medical Coverage Policy: 0557

exposure), clinical judgement should be used to determine whether a confirmatory NAAT should be performed.

Yet, as with antibody testing, Cigna has denied thousands of confirmatory PCR/NAAT tests billed by GSL to Cigna, in conflict with its own policy.

114. In yet another example of Cigna's words conflicting with its actions, Cigna states in its reimbursement policy that OON providers of Covid Testing services will be paid at rates consistent with CMS rates:



When no specific contracted rates are in place, Cigna will reimburse all covered COVID-19 diagnostic tests consistent with CMS reimbursement to ensure consistent, timely, and reasonable

tatic.cigna.com/assets/chcp/resourceLibrary/medicalResourcesList/medicalDoingBus

, 10:42 AM                    CHCP - Resources - Cign

reimbursement.

These CMS rates are much less than Cigna would pay to its INN providers, and they result in a financial loss for every test that GSL renders. This practice is a blatant contradiction of Cigna's public statements and the reimbursement requirements of Section 3202(a) of the CARES Act. It has harmed GSL by improperly paying GSL at impermissibly low rates, inflicting financial losses. When Cigna paid GSL for COVID testing services, it applied more than a dozen different rates for PCR testing and almost 100 different rates for antigen testing. The vast majority of claims were paid at less than 25% of GSL's posted cash price, which Cigna should have paid under the CARES Act.

115. On information and belief, it is likely that Cigna prepared and disseminated a significant amount of materials internally to its staff and other agents involved in any review of a Covid Testing claim regardless of whether it was at the point of initial receipt or appeals, and discovery obtained on this scheme will reveal the lengths to which Cigna has gone to circulate materials designed to undermine Cigna's obligations under the FFCRA and the CARES Act.

116. Cigna has used and relied upon (and continues to use and rely upon) the mails and wires to execute this scheme.

### 3.  Contradictory Adjustment Code Scheme

117. This scheme involves the use of mails and wires to fraudulently misrepresent a variety of adverse benefit determination adjustment and reason codes that intentionally contradict and undermine the Congressional mandates of the FFCRA and the CARES Act, which have amended the ERISA, the ACA, and the terms of

Cigna Health Plans (including the Cigna ASO Plans) to require mandatory coverage of medically appropriate Covid Testing services and reimbursement to OON providers in an amount equal to their publicized cash prices or a negotiated rate agreed to between Cigna and the OON provider.

118. When GSL performs Covid Testing services on Cigna Members, it bills the Covid Testing claim to Cigna for coverage and reimbursement. But despite the representations made to all stakeholders about compliance with the FFCRA, the CARES Act, and other applicable laws through the Public Misinformation Campaign Scheme, and despite the contradictory internal policies of Cigna as detailed in above in the "Contradictory Internal Policies Scheme" section, the adjustment and reason codes utilized by Cigna for its initial claims adjudication conflict with its public statements feigning compliance with applicable laws, conflict with its own internal coverage and reimbursement policies, and are not consistently applied despite the uniformity of the Covid Testing claims billed and the expected uniformity of results.

119. As the following items show, the adjustment and reason codes Cigna uses in initial adjudication of Covid Testing claims contradict and undermine the FFCRA and the CARES Act, along with Cigna's own public statements and/or Cigna's own internal policies.

- **CO-45: Charge exceeds your contracted/legislated fee arrangement.** This code conflicts with the reimbursement requirements of the CARES Act and with Cigna's own internal policies that claims are reimbursed at CMS rates because GSL is an OON provider with Cigna and is not subject to any contracted fee arrangements; therefore, the reimbursement requirement of Section 3202(a) of the CARES Act for OON providers of Covid Testing services is controlling.

- **CO-50: Non-covered services because this is not deemed a 'medical necessity' by the payer.** This code conflicts with both the coverage requirements of the FFCRA and the coverage requirements of Cigna's own internal policies because, before receiving Covid Testing services, each Cigna Member undergoes an individualized clinical assessment performed by a health care professional or an attending healthcare professional to determine if a Covid Test is medically appropriate to diagnose COVID-19.  When a test is deemed appropriate, the Cigna Member receives Covid Testing services. Under Section 6001 of the FFCRA, as amended, Cigna is required to provide coverage for such medically appropriate Covid Tests.

- **CO-109: Claim/service not covered by this payer/contractor.** This code conflicts with both the coverage requirements of the FFCRA and the coverage requirements of Cigna's own internal policies because, before receiving Covid Testing services, each Cigna Member undergoes an individualized clinical assessment performed by a health care professional or an attending healthcare professional to determine if a Covid Test is medically appropriate to diagnose COVID-19.  When a test is deemed appropriate, the Cigna Member receives Covid Testing services. Under Section 6001 of the FFCRA, as amended, Cigna is required to provide coverage for such medically appropriate Covid Tests.

- **CO-147: Provider contracted/negotiated rate expired or not on file.** This code conflicts with the reimbursement requirements of the CARES Act and conflicts with Cigna's own internal policies that claims are reimbursed at CMS rates. GSL is an OON provider with Cigna and is not subject to any contracted fee arrangements; therefore, the reimbursement requirement of Section 3202(a) of the CARES Act for OON providers of Covid Testing services is controlling.

- **OA-94: Processed in excess of charges.** This code conflicts with the reimbursement requirements of the CARES Act and with Cigna's own internal policies that claims are reimbursed at CMS rates because GSL is an OON provider with Cigna and is not subject to any contracted fee arrangements; therefore, the reimbursement requirement of Section 3202(a) of the CARES Act for OON providers of Covid Testing services is controlling. Additionally, GSL is an OON provider with Cigna, so unless Cigna paid GSL at an amount greater than required under Section 3202(a) of the CARES Act (which it has never done), then this code is not applicable under the circumstances created by the public health emergency.

- **PI-97: The benefit for this service is included in the payment/allowance for another service/procedure that has already been adjudicated.** This code conflicts with both the coverage requirements of the FFCRA and the coverage requirements of Cigna's own internal policies that require coverage

for confirmatory testing practices and antibody testing because, before receiving Covid Testing services, each Cigna Member undergoes an individualized clinical assessment performed by a health care professional or an attending healthcare professional to determine if a Covid Test is medically appropriate to diagnose COVID-19, and which tests are medically appropriate under the circumstances (rapid antigen, PCR, and/or antibody). Under Section 6001 of the FFCRA, as amended, Cigna is required to provide coverage for all tests deemed medically appropriate by the professional.

- **PI-109: Claim/service not covered by this payer/contractor.** This code conflicts with both the coverage requirements of the FFCRA and the coverage requirements of its own internal policies because, before receiving Covid Testing services, each Cigna Member undergoes an individualized clinical assessment performed by a health care professional or an attending healthcare professional to determine if a Covid Test is medically appropriate to diagnose COVID-19. When a test is deemed appropriate, the Cigna Member receives Covid Testing services. Thus, pursuant to Section 6001 of the FFCRA, as amended, Cigna is required to provide coverage for such medically appropriate Covid Tests.

- **PI-226: Information requested from the Billing/Rendering Provider was not provided or not provided timely or was insufficient/incomplete.** This code conflicts with the requirements of the FFCRA and Cigna own public statements because Section 6001 of the FFCRA prohibits the imposition of medical management requirements prior to determining whether a service should be covered and/or is medically necessary.[15] Additionally, Cigna has publicly represented that the receipt of a Covid Testing claim reflects an individual clinical assessment, thus, negating the need for pre-payment medical records requests.

- **PI-234: This procedure is not paid separately.** This code conflicts with both the coverage requirements of the FFCRA and the coverage requirements of its own internal policies because, before receiving Covid Testing services, each Cigna Member undergoes an individualized clinical assessment

---

[15] *See* The Departments' FAQs, Part 43, June 23, 2020 (https://www.cms.gov/files/document/ffcra-part-43-faqs.pdf).

Under the FFCRA, plans and issuers must provide this coverage without imposing any cost-sharing requirements (including deductibles, copayments, and coinsurance), prior authorization, or other medical management requirements (Footnote 6: Medical management includes medical necessity review (including concurrent review) and step-therapy

approaches, among other techniques.)

performed by a health care professional or an attending healthcare profes-
sional to determine if a Covid Test is medically appropriate to diagnose
COVID-19. When a test is deemed appropriate, the Cigna Member receives
Covid Testing services. Thus, under Section 6001 of the FFCRA, as amended,
Cigna is required to provide coverage for such medically appropriate Covid
Tests.

- **PR-1**: **Deductible Amount.** This code conflicts with both the coverage re-
quirements of the FFCRA and the coverage requirements of its own internal
policies because Section 6001 of the FFCRA prohibits the imposition of patient
cost-share obligations (*i.e.*, copay, deductible, coinsurance), and Cigna's own
public statements and internal policies purport to comply with this require-
ment. The FFCRA also prohibits Cigna from imposing or shifting any costs for
which Cigna is responsible to a Cigna Member—yet Cigna has consistently
shifted costs to its Cigna Members in violation of this law.

- **PR-24: Charge exceeds fee schedule/maximum allowable or con-
tracted/legislated fee arrangement.** This code conflicts with the reimburse-
ment requirements of the CARES Act and with Cigna's own internal policies
stating that claims must be reimbursed at CMS rates. GSL is an OON provider
with Cigna and is not subject to any contracted fee arrangements; therefore,
the reimbursement requirement of Section 3202(a) of the CARES Act for OON
providers of Covid Testing services is controlling.

- **PR-50: These are non-covered services because this is not deemed a
'medical necessity' by the payer.** This code conflicts with both the coverage
requirements of the FFCRA and the coverage requirements of its own internal
policies because, before receiving Covid Testing services, each Cigna Member
undergoes an individualized clinical assessment performed by a health care
professional or an attending healthcare professional to determine if a Covid
Test is medically appropriate to diagnose COVID-19. When a test is deemed
appropriate, the Cigna Member receives Covid Testing services. Thus, pursu-
ant to Section 6001 of the FFCRA, as amended, Cigna is required to provide
coverage for such medically appropriate Covid Tests.

- **PR-96: Non-covered charges.** This code conflicts with both the coverage re-
quirements of the FFCRA and the coverage requirements of its own internal
policies because, before receiving Covid Testing services, each Cigna Member
undergoes an individualized clinical assessment performed by a health care
professional or an attending healthcare professional to determine if a Covid
Test is medically appropriate to diagnose COVID-19. When a test is deemed
appropriate, the Cigna Member receives Covid Testing services. Thus, pursu-
ant to Section 6001 of the FFCRA, as amended, Cigna is required to provide
coverage for such medically appropriate Covid Tests.

- **PR-24: This service/equipment/drug is not covered under the patient's current benefit plan.** This code conflicts with both the coverage requirements of the FFCRA and the coverage requirements of its own internal policies because, before receiving Covid Testing services, each Cigna Member undergoes an individualized clinical assessment performed by a health care professional or an attending healthcare professional to determine if a Covid Test is medically appropriate to diagnose COVID-19. When a test is deemed appropriate, the Cigna Member receives Covid Testing services. Thus, pursuant to Section 6001 of the FFCRA, as amended, Cigna is required to provide coverage for such medically appropriate Covid Tests.

- **PR-242: Services not provided by network/primary care providers.** This code conflicts with the requirements of the FFCRA, its public representations, and its own internal policies because the FFCRA requires that any health plan subject to Section 6001 of the FFCRA, as amended, must cover Covid Testing services regardless of whether the services were performed by an INN or OON Provider.

- **PR-A1: Claim/service denied.** This code conflicts with both the coverage requirements of the FFCRA and the coverage requirements of its own internal policies because, before receiving Covid Testing services, each Cigna Member undergoes an individualized clinical assessment performed by a health care professional or an attending healthcare professional to determine if a Covid Test is medically appropriate to diagnose COVID-19. When a test is deemed appropriate, the Cigna Member receives Covid Testing services. Thus, pursuant to Section 6001 of the FFCRA, as amended, Cigna is required to provide coverage for such medically appropriate Covid Tests.

120. Cigna has allowed Covid Testing claims to be adjudicated in a manner that not only disregards all applicable laws that each of the Covid Testing claims are subject to, but also disregards the internal policies and requirements it has set for itself when adjudicating Covid Testing claims.

121. Despite the uniformity of claims adjudication that was expected under the FFCRA and the CARES Act (or at least its own internal policies), Cigna knew that a collection of inconsistent claims adjudication and reason codes would overwhelm GSL, making it nearly impossible for GSL to properly address the unlawful

nature of each Covid Test that Cigna refused to cover or pay, as GSL would need to invest a significant amount of resources in hopes of even having a remote chance of having the initial claim adjudication result overturned. Cigna's farcical internal administrative appeals process (detailed below) only multiplied GSL's burden.

122. Additionally, not only were these codes provided to GSL through the mails and wires, but Cigna also provided these codes to Cigna Members and the Cigna ASO Plans—also through mails and wires—for every Covid Testing claim, in furtherance of this fraudulent scheme.

### 4. Contradictory Explanation of Benefits ("EOB") Scheme

123. This scheme involves the use of the mails and wires by Cigna to disseminate materially false information regarding the initial adjudication of Covid Testing claims to GSL and other OON providers and to the Cigna Members and the Cigna ASO Plans for each of their respective Cigna Members.

124. On the Provider EOPs or Provider ERAs issued to GSL and other OON providers, Cigna claims that the amounts underpaid or held back from Cigna ASO Plan trust assets are "not covered" by the Cigna ASO Plans or are subject to "adjustments," and that the Cigna Member owes the balance. Yet on the Member EOB forms issued to the Cigna Members and the Cigna ASO Plans for the *same claim*, Cigna reports that GSL has agreed to a "discount" and the patient has "saved" the rest.

125. Specifically, once a claim is processed, Cigna transmits to GSL, through the wires, a Provider ERA which must provide certain information that complies with the standard transaction rules. GSL may also receive or request a paper Provider

EOP through the mails, which typically matches the information on the Provider ERA. Cigna, however, is not required to comply with any standard rules regarding Member EOBs, which are sent by Cigna through the mails and/or wires.

126.  When Cigna wrongfully underpays a Covid Testing claim (and other types of claims), it represents to GSL on the Provider EOP and the Provider ERA that the reduction represents the "[a]mount not covered." Cigna misleads GSL into believing that the Provider EOP and ERAs contain the same information that is sent to the Cigna Member.

127. The following screenshots include three inconsistent and contradictory representations made by Cigna on a single Covid Testing claim that were included by Cigna on the Provider ERA, the Provider EOP, and the Member EOB: The description of "amount not covered" utilized and included by Cigna on the Provider ERA states:

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Service Line Information** | | | | | | | | | | | | | |
| Begin Service Date | End Service Date | Rendering NPI | Paid Units | Proc/Rev Code, Mods | Billed Amount | Allowed Amount | Deduct Amount | Coins Amount | CoPay Amount | Late Filing Red. | Other Adjusts | Adjust Codes | Provider Paid | Remark Codes |
| 12/22/2021 | 12/22/2021 | | 1 | 87635 | $385.00 | $51.33 | $0.00 | $0.00 | $0.00 | $0.00 | $333.67 | CO-147 | $51.33 | M16 |
| SERVICE LINE TOTALS: | | | | | $385.00 | $51.33 | $0.00 | $0.00 | $0.00 | $0.00 | $333.67 | | $51.33 | |

CO : Contractual Obligations: Use this code when a joint payer/payee contractual agreement or a regulatory requirement resulted in an adjustment.

CO-147 : Provider contracted/negotiated rate expired or not on file. Start: 06/30/2002

128.  As discussed above in the "Contradictory Adjustment Code Scheme" section, GSL is an OON provider that does not have (nor has it ever had) an INN contract with Cigna, yet Cigna has wrongfully invoked this adjustment code for the Provider ERA. And again, the adjustment codes utilized by Cigna for the Provider EOP and the Member EOB are inconsistent and contradict one another.

129. The description of "amount not covered" utilized and included by Cigna on the Provider EOP states:



| Dates Of Service | Place Of Service | Amount Charged | Allowed Amount | Amount Not Covered | Deductible/Copay Applied | Covered Balance | Plan Coinsurance Paid | Patient Coinsurance | Patient Responsibility | Remark Codes |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/22/2021 | 81 | $385.00 | $51.33 | $333.67 | $0.00 | $51.33 | 100%= $51.33 | 0%= $0.00 | $0.00 | 1616 |
| | | $385.00 | $51.33 | $333.67 | $0.00 | $51.33 | $51.33 | $0.00 | $0.00 | |

Explanation of Remark Codes

1616

$333.67 PROVIDER THIS IS THE DATA ISIGHT ALLOWED AMOUNT OFFERED. DIRECT INQUIRIES TO 877.489.5984. MEMBER YOU MAY OWE MORE IF OFFER IS NOT ACCEPTED.

130. On the Provider EOP, Cigna makes no mention of a contracted rate or expired rate. Instead, it represents to GSL that the allowed amount (*i.e.* reimbursement rate) was unilaterally determined by a Repricing Company, Data iSight. Critically, Cigna also tells GSL in this Provider EOP that the Cigna Member may owe more to GSL if this offer is not accepted. This pushes GSL to collect the difference between the allowed/paid amount and the amount charged from the Cigna Member which GSL should be precluded from having to do if Cigna complied with its reimbursement obligations pursuant to Section 3202(a) of the CARES Act.[16]

---

[16] *See* The Departments' FAQs, Part 43, June 23, 2020 (https://www.cms.gov/files/document/ffcra-part-43-faqs.pdf):

**Q9. Does section 3202 of the CARES Act protect participants, beneficiaries, and enrollees from balance billing for a COVID-19 diagnostic test?**

The Departments read the requirement to provide coverage without cost sharing in section 6001 of the FFCRA, together with section 3202(a) of the CARES Act establishing a process for setting reimbursement rates, as intended to protect participants, beneficiaries, and enrollees from being balance billed for an applicable COVID-19 test. Section 3202(a)

131. Cigna's description of the "amount not covered" on the Member EOB states:

| Amount Billed | $385.00 | This was the amount that was billed for your visit on 12/22/2021. |
|---|---|---|
| Discount | $333.67 | You saved $333.67. CIGNA negotiates discounts with health care professionals and facilities to help you save money. |
| What CIGNA plan paid | $51.33 | CIGNA paid $51.33 to GS LABS. |
| What I owe | $0.00 | This is the amount you owe after your discount, your CIGNA plan paid, and what your accounts paid. People usually owe because they may have a deductible, have to pay a percentage of the covered amount, or for care not covered by their plan. Any amount you paid since care was received may reduce the amount you owe. |
| You saved | 100% | You saved $385.00 (or 100%) off the total amount billed. This is a total of your discount and what your CIGNA plan paid. To maximize your savings, visit www.myCIGNA.com or call customer service to estimate treatment costs, or to compare cost and quality of in-network health care professionals and facilities. |

132. Again, on this Member EOB, Cigna makes no mention of a contracted or expired rate. Instead, Cigna explicitly represents to the Cigna member that GSL negotiated, and thus agreed to, a "Discount" on this claim (which is false) and that the Cigna Member has "saved" 100% because of the rate purportedly negotiated by Cigna. Cigna describes this "Discount" on the Member EOB as follows: "CIGNA negotiates discounts with healthcare professionals and facilities to help you save money" to intentionally mislead the patient into believing that their provider, including GSL, agreed to the represented "Discount." Neither GSL nor any other OON provider would know that Cigna is making these false and contradictory statements to Cigna

---

contemplates that a provider of COVID-19 testing will be reimbursed either a negotiated rate or an amount that equals the cash price for such service that is listed by the provider on a public website. In either case, the amount the plan or issuer reimburses the provider constitutes payment in full for the test, with no cost sharing to the individual or other balance due. Therefore, the statute generally precludes balance billing for COVID-19 testing.

Members and each of the respective Cigna ASO Plans unless GSL obtained the Member EOB.

133. Additionally, Cigna is informing the Cigna Members that they no longer have any financial responsibility for this claim while simultaneously telling GSL the opposite—*i.e.*, that if GSL does not accept the rate that Cigna has unilaterally imposed, it should balance bill the Cigna Member for the difference between the amount paid and the amount that should have been paid. This instruction puts GSL in a vulnerable position with Cigna Members as the Cigna Members have already been informed that they owe nothing.  And the FFCRA and CARES Act guidance were meant to preclude GSL from also having to balance bill Cigna Members.

134. Cigna's false and misleading statements in furtherance of its Contradictory EOB Scheme have directly harmed GSL. Sometimes, GSL is misled into thinking it must balance bill the Cigna Members for the amounts Cigna indicates on the Provider EOPs/ERAs are "not covered." If GSL were to balance bill Cigna Members for Covid Testing claims performed during the public health emergency for the amounts reported as "not covered" on the Provider EOPs/ERAs then GSL would damage its goodwill and reputation because Cigna has misinformed the Cigna Members that the underpaid amounts represent "discounts" and "savings." And in all cases, GSL is forced to incur unnecessary time and expense pursuing amounts to which they are entitled under the Cigna Health Plans, including the Cigna ASO Plans, and entitled to by law.

### 5.   Repricing Reduction Scheme

135.  The Repricing Reduction Scheme is a scheme that is built upon the back of the Contradictory EOB Scheme, and the facts and examples detailed in the Contradictory EOB Scheme are also relevant to this scheme.

136.  Through the Repricing Reduction Scheme, Cigna conspires with Repricing Companies to pay itself, from embezzled and/or converted Cigna ASO Plan trust assets, extra "savings" fees.

137.  Prior to explaining the details of this scheme, it is important to understand that Cigna, through its ASO Agreements, puts itself in a position where it has complete and unfettered access to each of the Cigna ASO Plans' trust assets.  Its only goal is to create an appearance or illusion that any money withdrawn from these trust assets is for legitimate reasons.

138.  The following language appears in a Cigna ASO Agreement that confirms Cigna's unfettered (and unchecked) access to Cigna ASO Plan trust assets:

**Section 3.      Banking Arrangements**

A.   <u>Establishment and Maintenance of Transfer Account</u>.  With respect to all Plan's claims and Client's obligations under this Contract, except as otherwise provided elsewhere in this Agreement or in any Appendices, the Client shall establish and maintain a bank account ("the Transfer Account") and make available funds in the Transfer Account sufficient to honor the Client's claim administration fee, premium and any other financial obligations under this Contract.

B.   <u>Right of Company to Demand Monies from Transfer Account</u>.  The Company shall have the right to demand monies from the Transfer Account in the amounts sufficient to satisfy the Client's obligations under this Contract that have been incurred or due as of the date of demand, including past due, overdue or other unsatisfied obligations, if any.  The Company shall not be authorized to demand monies from the Transfer Account for any purpose other than in order to satisfy the Client's obligations under this Contract.

C.   <u>Notice to Bank of Company's Rights</u>.  The Client shall notify the bank (i) that the Client has authorized the Company to demand monies from the Transfer Account, and (ii) that the bank shall honor any such demand from the Company without reservation or proof of rights of any kind whatsoever and (iii) that if the Transfer Account does not have sufficient funds to cover any demand by the Company that the bank shall honor such demand pursuant to the overdraft protection established by the Client.

139.  Cigna's "savings" process generally works as follows:

140. A health care provider may enter into an OON contract with a third-party Repricing Company, whereby the OON provider agrees to have its billed charge reduced in accordance with a specified contract rate or schedule. Under this contract, the OON provider accepts reduced payments on its claims (including the patient's cost-share obligation) as payment in full. At the same time, the OON provider waives its right to balance bill the patient. Notably, GSL has not entered into any OON contracts with any third-party Repricing Companies.

141. Cigna's ASO Agreements with the Cigna ASO Plans, which agreements are drafted by Cigna, allow for Cigna to apply discounts available under third-party contracts or through negotiation of billed charges. In these instances, Cigna will apply those discounted rates to the provider's billed charge, calling it the "allowed amount" of the claim—even though the "allowed amount" resulting from these third-party contracts is typically well below the allowed amounts payable under the Plans, or in this case, what is mandated by Section 3202(a) of the CARES Act.

142. Cigna then pays itself a "savings" fee, which ranges from 20% to 40% of "savings realized" (the difference between the claim priced under the alleged Repricing Company contract/negotiation and the OON provider's billed charges or, in this case, the cash price). Cigna's ASO agreements with Cigna ASO Plans allows Cigna to pay itself these "savings" fees directly from the Cigna ASO Plans' trust assets (to which it enjoys unfettered access):

**Section 16.    Other Financial Provisions**

A.    Savings Initiatives.

(1) In its sole discretion, the Company may undertake initiatives in addition to the services described in this Contract for the purpose of saving additional money for the Plan. Examples of such initiatives might include, but are not limited to, subrogation and right of recovery, provider bill/fee negotiation and discounts on claims from providers outside of the Company's primary network of providers, and COB identification and recovery when performed by a third party vendor.

(2) For purposes of pursuing savings under this provision, the Company may retain third party vendors.

(3) For its services in obtaining savings for the Plan, the Company shall be entitled to retain (i) for subrogation and right of recovery, the amount referred to in subsection 16.B below, and (ii) for all other savings initiatives, 35.4% of any savings realized.

Vendor fees for these cost containment services shall be reimbursed from the Transfer Account. Specific vendor fees and care management program services are available upon request.

143.   Upon information and belief, Cigna pays 7% to 11% of these 20% to 40% savings fees to their contracted Repricing Companies for their services. Again, these fees are calculated as a percentage of savings, which provides an incentive for Cigna and the Repricing Companies to conspire to pay GSL the smallest amount on a Covid Testing claim, thereby maximizing their profits. Consequently, they often pay themselves more than what Cigna pays GSL for having performed the actual test.

144.   Take the following EOB as an example:

| Amount Billed | $385.00 | This was the amount that was billed for your visit on 12/22/2021. |
|---|---|---|
| Discount | $333.67 | **You saved $333.67.** CIGNA negotiates discounts with health care professionals and facilities to help you save money. |
| What CIGNA plan paid | $51.33 | CIGNA paid $51.33 to GS LABS. |
| What I owe | $0.00 | This is the amount you owe after your discount, your CIGNA plan paid, and what your accounts paid. People usually owe because they may have a deductible, have to pay a percentage of the covered amount, or for care not covered by their plan. Any amount you paid since care was received may reduce the amount you owe. |
| You saved | **100%** | You saved $385.00 (or 100%) off the total amount billed. This is a total of your discount and what your CIGNA plan paid. To maximize your savings, visit www.myCIGNA.com or call customer service to estimate treatment costs, or to compare cost and quality of in-network health care professionals and facilities. |

If Cigna charged a 35.4% "savings" fee on this Covid Testing claim (discussed further in the Contradictory EOB Scheme described in the previous section), then Cigna would have paid itself $118.12 ($333.67 x 35.4%) while paying GSL a mere $51.33. This is egregious: Cigna has not just implemented schemes that undermine its obligations to comply with the FFCRA and the CARES Act, but results in Cigna's embezzling and/or converting Cigna ASO Plans' trust assets in amounts greater than what it withdraws and pays GSL from those trust assets on the same Covid Testing claim (and likely many other types of claims).

145. As described above, Cigna intentionally pays Covid Testing claims (and other OON claims) at amounts less than GSL's cash prices despite the reimbursement mandate of Section 3202(a). The "savings" process is nothing more than a vehicle for Cigna to improperly earn additional profits at GSL's expense.

146. Additionally, rather than negotiate a rate agreement with GSL in the spirit of the negotiation element of Section 3202(a) of the CARES Act, Cigna intentionally *avoids* negotiating with GSL because it has a unique opportunity to consistently embezzle and/or convert the trust assets of Cigna ASO Plans at unprecedented levels given the circumstances created by COVID-19 and the public health emergency.

147. Cigna's representations in its EOBs that it has "negotiate[d] discounts with health care professionals and facilities" are clearly false as applied to GSL, which has not contracted with any Repricing Companies to accept any agreed-upon discount and forgo balance billing Cigna Members. Indeed, Cigna's "savings" fee is

calculated when the claim is initially processed, regardless of whether GSL has agreed to the discount.

148.  Cigna's use of the mails and wires in furtherance of the Repricing Reduction Scheme has damaged GSL by diverting Cigna ASO Plans' trust assets away from GSL to allow Cigna to pay itself and its contracted repricing companies "savings fees" on the purported "savings" that Cigna has achieved for the Cigna ASO Plans. Cigna's conduct has also forced GSL to incur unnecessary administrative costs in attempting to recover funds due and payable to GSL under the Cigna Health Plans, including the Cigna ASO Plans.

### 6.  Member Balance Billing Scheme

149.  Among other things, Congress passed the FFCRA and the CARES Act to ensure that no out-of-pocket costs for medically appropriate Covid Testing services were shifted to any individual.

150.  The Departments issued guidance materials, including FAQs, that specifically required that all private health plans subject to Section 6001 of the FFCRA (*e.g.* Cigna Health Plans), reimburse OON providers of Covid Testing services in accordance with the methodology prescribed by Congress under Section 3202(a) of the CARES Act to ensure that no person is left financially responsible for the balance between what was paid by the person's health plan and what was charged by the OON Provider (the "Balance Bill"):

**Q9. Does section 3202 of the CARES Act protect participants, beneficiaries, and enrollees from balance billing for a COVID-19 diagnostic test?**

The Departments read the requirement to provide coverage without cost sharing in section 6001 of the FFCRA, together with section 3202(a) of the CARES Act establishing a process for setting reimbursement rates, as intended to protect participants, beneficiaries, and enrollees from being balance billed for an applicable COVID-19 test. Section 3202(a) contemplates that a provider of COVID-19 testing will be reimbursed either a negotiated rate or an amount that equals the cash price for such service that is listed by the provider on a public website. In either case, the amount the plan or issuer reimburses the provider constitutes payment in full for the test, with no cost sharing to the individual or other balance due. Therefore, the statute generally precludes balance billing for COVID-19 testing. However, section 3202(a) of the CARES Act does not preclude balance billing for items and services not subject to section 3202(a), although balance billing may be prohibited by applicable state law and other applicable contractual agreements.[17]

151. However, despite the clear instructions from Congress and the Departments to Cigna to comply with Section 3202(a) of the CARES to ensure that no Cigna Member is left financially responsible for the balance bill, Cigna not only engages in the various and related schemes to underpay GSL in violation of the CARES Act, but it also shifts financial responsibility of the balance bill (*i.e.*, the difference between the amount it should have paid and the amount it actually did pay) to its Cigna Members.

152. For example, Cigna has adjudicated the following Covid Testing claim in a manner that (i) results in Cigna paying nothing to GSL and (ii) intentionally shifts the financial responsibility of the balance bill amount to the Cigna Member, thus (iii) requiring GSL to balance bill the Cigna Member if GSL has any hopes of payment on this Covid Testing claim:



Claim Information

Claim/Reference Number:

Patient Name: | View Coverage

Provider Generated Patient Account Number:

Service Providers: /GS LABS

Date Received: 02/17/2022

Date Processed: 02/22/2022

HIPAA Status: F2: 1

Claim Status: ✓ Processed

Payment Information ⓘ

Patient Responsibility: $116.93

Claim Amount Paid: $0.00

Procedures

| Procedure Code | Dates Of Service | Place Of Service | Amount Charged | Allowed Amount | Amount Not Covered | Deductible/Copa Applied | Covered Balance | Plan Coinsurance Paid | Patient Coinsurance | Patient Responsibility |
|---|---|---|---|---|---|---|---|---|---|---|
| 87811 | 02/11/2022 | 11 | $179.00 | $0.00 | $179.00 | $0.00 | $0.00 | 0%= $0.00 | 100%= $0.00 | $116.93 |
| G2023 | 02/11/2022 | 11 | $50.00 | $0.00 | $50.00 | $0.00 | $0.00 | 0%= $0.00 | 100%= $0.00 | $0.00 |
| Totals | | | $229.00 | $0.00 | $229.00 | $0.00 | $0.00 | $0.00 | $0.00 | $116.93 |

Explanation of Remark Codes

1231

$179.00 FOR OUT-OF-NETWORK SERVICES, CIGNA WILL REIMBURSE YOU UP TO A SET MAXIMUM AMOUNT (KNOWN AS MAXIMUM REIMBURSABLE CHARGE IN YOUR PLAN BOOKLET). YOUR HEALTH CARE PROFESSIONAL MAY BILL YOU FOR ANYTHING ABOVE THIS AMOUNT.

1230

$179.00 HEALTH CARE PROFESSIONAL: THE PATIENT SHOULD NOT BE LIABLE IF YOU ACCEPT THE ALLOWABLE AMOUNT. CUSTOMER: CALL CIGNA AT THE NUMBER ON YOUR CIGNA ID CARD IF YOUR HEALTH CARE PROFESSIONAL BILLS YOU MORE THAN THE "WHAT I OWE" AMOUNT ON THE FRONT OF THIS EXPLANATION OF BENEFITS.

153. Remark Code "1231" states—and therefore admits—that this claim was not initially adjudicated in compliance with the reimbursement methodology of the CARES Act, and directly contradicts the Departments' FAQ that explains the significance of complying with the CARES Act to ensure no person, like the Cigna Member above, is balance billed for Covid Testing services.

154. Additionally, Remark Code "1230" is another tacit admission that Cigna is requiring GSL to bill and collect outstanding balance bill amounts directly from Cigna Members.

155. Cigna communicates the balance bill amounts, and the fraudulent reasons why each Cigna Member is responsible for these amounts, on the Provider ERAs, Provider EOPs, and/or the Member EOBs, and all such communications are made through the mails and wires to GSL and other OON providers, Cigna Members, and Cigna ASO Plans. Cigna's conduct has harmed GSL by forcing GSL to incur needless administrative costs in attempting to recover funds due and payable to GSL under the Cigna Health Plans, including the Cigna ASO Plans.

### 7. Member Cost-Share Billing Scheme

156. Through the FFCRA and the CARES Act, Congress strictly prohibited private health insurance plans subject to Section 6001 of the FFCRA, as amended, from shifting any patient cost-share obligations (*i.e.* copay, deductible, coinsurance) to insured persons.

157. The Departments issued guidance materials, including FAQs, that specifically required that all private health plans subject to Section 6001 of the FFCRA (*e.g.* Cigna Health Plans) not shift any member cost-share obligations to the insured members:

**The FFCRA and the CARES Act**

The FFCRA was enacted on March 18, 2020.[3] Section 6001 of the FFCRA generally requires group health plans and health insurance issuers offering group or individual health insurance coverage to provide benefits for certain items and services related to diagnostic testing for the detection of SARS-CoV-2 or the diagnosis of COVID-19 (referred to collectively in this document as COVID-19) when those items or services are furnished on or after March 18, 2020, and during the applicable emergency period. Under the FFCRA, plans and issuers must provide this coverage without imposing any cost-sharing requirements (including deductibles, copayments, and coinsurance) or prior authorization or other medical management requirements.

**Q6.** ==May a plan or issuer impose any cost-sharing requirements,== prior authorization requirements, or medical management requirements ==for benefits that must be provided under section 6001(a) of the FFCRA, as amended by section 3201 of the CARES Act?==

==No.  Section 6001(a) of the FFCRA provides that plans and issuers shall not impose any cost-sharing requirements (including deductibles, copayments, and coinsurance),== prior authorization requirements, or other medical management requirements for these items and services.  These items and services must be covered without cost sharing when medically appropriate for the individual, as determined by the individual's attending healthcare provider in accordance with accepted standards of current medical practice.

158.  Yet despite the clear instructions from Congress and the Departments to Cigna to comply with Section 6001 of the FFCRA to ensure that no Cigna Member is left financially responsible for any cost-share obligations, Cigna not only engages in schemes to underpay GSL in violation of the CARES Act, but it also unlawfully shifts financial responsibility of the cost-share obligations to its Cigna Members.

159.  For example, Cigna has adjudicated the following Covid Testing claim in a manner that results in Cigna paying *nothing* to GSL, while intentionally shifting the financial responsibility of the cost-share amount to the Cigna Member.  GSL must therefore bill the deductible to the Cigna Member if it is to obtain any payment on this claim.

| Line | Procedure date | Procedure code | DRG/ APC Code | Billed Amount | Discount | Amount Not covered | Covered Amount | Copay / Deductible Amount | Plan Paid | Coinsurance | Patient Owes | See Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01/23 - 01/23/22 | 87811 | | 179.00 | 96.24 | 0.00 | 82.76 | 82.76 | 0.00 | 0.00 | 82.76 | 691 |
| 2 | 01/23 - 01/23/22 | G2023 | | 50.00 | 0.00 | 0.00 50.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 | VNR e27 |
| Total | | | | $229.00 | $96.24 | $50.00 | $82.76 | $82.76 | $0.00 | $0.00 | $132.76 | |
| Payment of $0.00 to GS LABS | | | | | | | | | | | | |

*Reminder: A coverage determination, prior authorization, or certification that is made prior to a service being performed is not a promise to pay for the service at any particular rate or amount. The patient's summary plan description typically governs this, as every claim submitted is subject to all plan provisions, including, but not limited to, eligibility requirements, exclusions, limitations, and applicable state manda. If you'd like information on how much the customer met towards their accumulators (e.g., deductibles),  please visit our website at cignaforhcp.com or contact customer service.*

**NOTES**
==691-DO NOT BILL THE PATIENT FOR THE TRN DISCOUNT THROUGH ZELIS. PLEASE CALL 888.663.6776 FOR DISCOUNT INFORMATION.==
VNR-HEALTH CARE PROFESSIONAL: THE SERVICE THIS PROCEDURE CODE REPRESENTS IS MUTUALLY EXCLUSIVE TO ANOTHER PROCEDURE CODE ON THIS CLAIM.
e27-THE SUBMITTED PROCEDURE IS DISALLOWED BECAUSE IT IS INCIDENTAL TO A CODE BILLED ON THE SAME DATE OF SERVICE.

## Claim Information

| | |
|---|---|
| Claim/Reference Number: | |
| Patient Name: |  | View Coverage |
| Provider Generated Patient Account Number: | |
| Service Providers: | GS LABS |
| Date Received: | 01/31/2022 |
| Date Processed: | 02/07/2022 |
| Claim Status: | ✓ Processed |

## Payment Information ⓘ

| | |
|---|---|
| Other Insurance Paid: | $0.00 |
| Your Plan Paid: | $0.00 |
| Patient Responsibility: | $132.76 |

## Payment Details

ⓘ Payments that indicate a paid amount greater than the paid amount listed in the details above indicate a bulk payment made to the provider that includes payments for other claims.

| Payee's Name | Payee's Address | Payment Amount | Remittance Tracking Number | Payment Issued | Payment Method |
|---|---|---|---|---|---|
| GS LABS | 17650 WRIGHT ST STE 5 OMAHA, NE 68130 | $0.00 | -- | 02/07/2022 | EFT |

## Procedures

| Procedure Code | Dates Of Service | Place Of Service | Amount Charged | Allowed Amount | Amount Not Covered | Deductible/Copay Applied | Covered Balance | Plan Coinsurance Paid | Patient Coinsurance | Patient Responsibility |
|---|---|---|---|---|---|---|---|---|---|---|
| 87811 | 01/23/2022 | 11 | $179.00 | $82.76 | $96.24 | $82.76 / $0.00 | $0.00 | $0.00 | $0.00 | $82.76 |
| G2023 | 01/23/2022 | 11 | $50.00 | $0.00 | $50.00 | $0.00 / $0.00 | $0.00 | $0.00 | $0.00 | $50.00 |
| Totals | | | $229.00 | $82.76 | $146.24 | $82.76 / $0.00 | $0.00 | $0.00 | $0.00 | $132.76 |

## Summary of a claim for services on January 23, 2022

for services provided by GS LABS.

| Amount Billed | $229.00 | This was the amount that was billed for your visit on 01/23/2022. |
|---|---|---|
| Discount | $96.24 | You saved $96.24. Cigna negotiates discounts with health care professionals and facilities to help you save money. |
| Amount not covered | $50.00 | This is the portion of your bill that's not covered by your plan. You may or may not need to pay this amount. See the Notes section on the following pages for more information. |
| What my plan paid | $0.00 | Your plan did not pay any of the amounts billed. This could be because you haven't met your deductible yet or your plan doesn't cover the services you received. |
| What I Owe | $132.76 | This is the amount you owe after your discount, what your plan paid, and what your accounts paid. People usually owe because they may have a deductible, have to pay a percentage of the covered amount, or for care not covered by their plan. Any amount you paid when you received care may reduce the amount you owe. |
| You saved | 42% | You saved $96.24 (or 42%) off the total amount billed. This is a total of your discount and what your plan paid. To maximize your savings, visit MyCigna.com or call customer service to estimate treatment costs, or to compare cost and quality of in-network health care professionals and facilities. |

160.  Not only does Cigna fail to pay GSL anything after shifting the cost-share obligations to the financial responsibility of the Cigna Member, but Cigna takes a percentage of the "savings" for itself based upon the "savings" or "discount" it has manufactured.  Thus, Cigna still takes additional profits on this claim through the Repricing Reduction Scheme while simultaneously forcing GSL to bill the Cigna Member for his/her deductible. This is a flagrant disregard of the FFCRA and the CARES Act, and egregious example of Cigna embezzling and/or converting funds from Cigna ASO Plans in the midst of a public health emergency.

161. Cigna communicates to the Cigna Member cost-share amounts and the fraudulent reasons why each Cigna Member is responsible for the cost-share amounts on the Provider ERAs, Provider EOPs, and/or the Member EOBs, and all such communications are made through the mails and wires to GSL and other OON providers, Cigna Members, and Cigna ASO Plans. Cigna's conduct has also harmed GSL by forcing GSL to incur unnecessary administrative costs in attempting to recover funds due and payable to GSL under the Cigna Health Plans, including the Cigna ASO Plans.

### 8.   Sham Internal Administrative Appeals Scheme

162.  Not only is Cigna violating the FFCRA and/or the CARES Act in its initial adjudication of Covid Testing claims, but when GSL appeals the adverse benefit determinations on behalf of Cigna Members, Cigna's internal administrative appeals process improperly disregards Cigna's obligation to ensure that all Cigna Health

Plans subject to Section 6001 of the FFCRA, including the Cigna ASO Plans, comply with the governing laws and the terms of all private Cigna Health Plans.

163. Throughout the pandemic, GSL has submitted thousands of appeals on behalf of Cigna Members, and Cigna did not reconsider a single Covid Testing claim even though GSL's appeal letters informed Cigna and its internal administrative appeals department of Cigna's obligations under the FFCRA and the CARES Act. Instead, Cigna routinely disregards GSL's arguments and upholds its initial determinations—the result being the non-coverage of Covid Testing claims and/or improper reimbursements to GSL. These appeals are effectively rubber stamps that afford GSL no meaningful relief.

164. The manner in which Cigna administers its sham administrative appeals process is even more egregious considering that Cigna has publicly proclaimed through its Public Misinformation Campaign Scheme that it intends to comply with the FFCRA and the CARES Act and consistently represents in its own internal policies that federal and state laws and mandates supersede its own internal policies.

165. Importantly, for all health plans subject to Section 6001 of the FFCRA, as amended, the Cigna Health Plans, including the Cigna ASO Plans, are obligated to comply with (i) the ACA's claims and appeals procedures prescribed in 45 CFR § 147.136, and (ii) for all private health plans also subject to ERISA, ERISA's claims and appeals procedures prescribed in 29 CFR § 2560.503-1. The ACA and ERISA require Cigna to maintain a benefit determination and claim appeal process that provides a full, meaningful, and independent review, and that affords plan

beneficiaries and claimants broad rights to accurate, timely and substantive information regarding the reasons, rules, methodologies, terms, provisions and interpretations that underlie the benefit determinations.

166. Yet Cigna's appeal responses fail to comply with even the most basic requirements established by the ACA and ERISA. Among other things, Cigna routinely:

- failed to provide the specific reason or reasons for their benefit determinations or review determinations;
- failed to make reference to the specific plan provisions on which their benefit
- determinations or review determinations were based;
- made materially false and misleading statements concerning their processing of claims, and refused to disclose the true internal rules, guidelines, protocols and criteria that were relied upon in making the benefit and review determinations;
- failed to provide GSL with a sufficient description of the underlying health plan's review procedures;
- failed to provide review of appeals that did not afford deference to the initial benefit determination, and which was conducted by an appropriate named fiduciary of the plan who is independent of the person who made the initial benefit determination; and
- denied GSL's efforts to become sufficiently acquainted with the terms of the underlying health plans, as well as the true methods used to reimburse GSL's claims, thereby rendering the administrative appeal a futile and meaningless endeavor.

167. A few representative examples of Cigna's appeal responses to GSL reveal Cigna's blatant disregard for the FFCRA and/or the CARES Act and/or its own internal policies. All appeal responses were sent from Cigna to GSL through the mails.

168. Example 1 of Cigna's appeal responses is as follows:

**Thank you for contacting us about a recent claim. Please continue reading for an update on its status and where to go for more information.**

Hello Gs,

If you disagree with the savings/discount amount applied by Zelis, please contact them at 800.755.3485. When contacting the vendor, please be prepared to provide them with the specific reason(s) you are disputing the savings/discount amount applied.

Hello Gs,

If you disagree with the savings/discount amount applied by Data iSight, please contact them at 877.489.5984. When contacting the vendor, please be prepared to provide them with the specific reason(s) you are disputing the savings/discount amount applied.

On July 1, 2022, we received an appeal request concerning our decision to process the Covid-19 testing services provided to your dependent, ~~████~~ on 11/3/2021 subject to a discount negotiated by Zelis. The service appealed is procedure code 87811 (Infectious agent antigen detection by immunoassay with direct optical (ie, visual) observation; severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-19])) for diagnosis code Z20.822.

**Appeal Decision**
After reviewing the appeal submitted by GS Labs, the original decision to process the testing services provided to ~~████~~ on 11/3/2021 subject to a discount negotiated by Zelis is upheld. All the original information in your file, the information submitted with this request and the terms of your benefit plan were reviewed.

169.  In these responses, Cigna makes no mention of any laws or policies applicable to the adjudication of a Covid Testing claim, which, at a minimum, it is required to do under ERISA and the ACA's claims procedures. Cigna simply redirects GSL to reach out to a third-party Repricing Company to dispute the payment, so that in the event an additional amount is paid on the Covid Testing claim (but never the full amount as required by Section 3202(a) of the CARES Act), Cigna can still pocket (for itself and the Repricing Company) the "savings" amount.

170.  Example 2 of Cigna's appeal responses is as follows:

On January 20, 2022, we received an appeal request concerning our decision to apply Vendor Pricing on your claim for procedure code 87811 (Detection test by immunoassay with direct visual observation for severe acute respiratory syndrome coronavirus 2 (COVID-19)) billed on October 12, 2021 with diagnosis code Z20.822.

**Appeal Decision**
After reviewing the appeal submitted by GS Labs, the original decision to apply Vendor Pricing on your claim for procedure code 87811 is upheld. All the original information in your file, the information submitted with this request and the terms of your benefit plan were reviewed.

Hello Gs Labs, LLC,

Thank you for writing to us about the claim for the customer named above.

Our records indicate the claim reimbursement amount was based on the Federal Qualified Payment Amount determined by an outside vendor, DIS repricing. The QPA methodology was used to calculate the allowable/cost share on claims. The CAA and QPA pricing methodology is based on the No Surprises Act, effective with dates of service 01/01/2022, which prohibits out of network (OON) providers from balance billing patients for more than their in-network cost share when seeking emergency services or certain services from out-of-network providers at in-network facilities.
If you disagree with the QPA allowable applied by the Vendor, please contact them at 877.489.5984.
When contacting the vendor, please be prepared to provide them with the specific reason(S) you are disputing the savings/discount amount applied.

171. As with Example 1, Cigna again fails to provide a response that complies with even the basic requirements of the ERISA and ACA claims procedures. Moreover, rather than responding to GSL's arguments and concerns demonstrating that this Covid Testing was not reimbursed in accordance with Section 3202(a) of the CARES Act, Cigna reflexively upholds the "Vendor Pricing" (*i.e.*, third-party Repricing Company pricing) so that it can keep for itself the trust assets it embezzled and/or converted for itself through the Repricing Reduction Scheme.

172. Example 3 of Cigna's appeal responses is as follows:

On November 17, 2022, we received an appeal request concerning our decision to deny the procedure code 87811 [Detection test by immunoassay with direct visual observation for severe acute respiratory syndrome coronavirus 2 (COVID-19)], for your dependent ~~██████████~~, performed on April 27, 2021 by GS Labs as it was mutually exclusive to a code billed on the same date of service for a prior claim.

**Appeal Decision**
After reviewing the appeal submitted by GS Labs, the original decision to deny the procedure code 87811, for your dependent, ~~██████████~~ performed on April 27, 2021 as it was mutually exclusive to a code billed on the same date of service for a prior claim is upheld. All the original information in your file, the information submitted with this request and the terms of your benefit plan were reviewed.

173. In this appeal response, Cigna violates Section 6001 of the FFCRA in denying medically appropriate Covid Testing services that should otherwise be covered when determined as medically appropriate by an attending healthcare provider. Additionally, this response is evidence that Cigna is undermining CDC and IDSA

guidance in denying medically appropriate confirmatory testing and its own internal policies that purport to align with the same CDC and IDSA guidance.

174.  Example 4 of Cigna's appeal responses is as follows:

Dear Gs Labs, LLC,

Your request for a Single Level Provider Payment Appeal for the service referenced above has been completed. After reviewing your request, we have decided to uphold the original decision.

The fee schedule appeal referenced above has been reviewed and denied based on your contracted fee schedule amount. We have reviewed the claim in question and determined that, according to your contract, no additional payment is due.

175.  In this response, Cigna misrepresents the network status of GSL as an INN provider as opposed to an OON provider. It is impossible for GSL to appeal claims or respond to appeals of claims when Cigna intentionally mischaracterizes its network status.

176.  Example 5 of Cigna's appeal responses is as follows:

On July 25, 2022, we received an appeal request concerning our decision to allow service code 0202U (Test for detection of respiratory disease-causing organisms from back of nose and throat (nasopharynx) specimen, 22 target organisms including severe acute respiratory syndrome coronavirus 2) billed with diagnosis code Z20.822 performed on May 02, 2021 by GS Labs at Maximum Reimbursable Charge and not allow 100% of the billed charge.

**Appeal Decision**
After reviewing the appeal submitted by GS Labs LLC, the original decision to allow service code 0202U (Test for detection of respiratory disease-causing organisms from back of nose and throat (nasopharynx) specimen, 22 target organisms including severe acute respiratory syndrome coronavirus 2) billed with diagnosis code Z20.822 performed on May 02, 2021 by GS Labs at Maximum Reimbursable Charge and not allow 100% of the billed charge is upheld. All the original information in your file, the information submitted with this request and the terms of your benefit plan were reviewed.

On November 14, 2022, we received an appeal request concerning our decision to allow service code 87635 (Amplifed DNA or RNA probe detection of severe acute respiratory syndrome coronavirus 2 (Covid-19) antigen) billed with diagnosis code Z20.822 performed on July 20, 2021 by GS Labs at Maximum Reimbursable Charge and not allow 100% of the billed charge.

**Appeal Decision**
After reviewing the appeal submitted by GS Labs LLC, the original decision to allow service code 87635 (Amplifed DNA or RNA probe detection of severe acute respiratory syndrome coronavirus 2 (Covid-19) antigen) billed with diagnosis code Z20.822 performed on July 20, 2021 by GS Labs at Maximum Reimbursable Charge and not allow 100% of the billed charge is upheld. All the original information in your file, the information submitted with this request and the terms of your benefit plan were reviewed.

177.  In this appeal response, Cigna has reimbursed the covered Covid Testing services at its Maximum Reimbursable Charge ("MRC")—which is arbitrarily determined by Cigna—and reflexively upholds this decision despite GSL's position on appeal that must reimburse GSL using the reimbursement methodology of Section 3202(a) of the CARES Act. Importantly, Cigna insists that this claim should be paid at an MRC level and not even in accordance with its own internal reimbursement guidelines.

178.  Example 6 of Cigna's appeal responses is as follows:

> On September 30, 2022, we received an appeal request concerning our decision to deny coverage for procedure code 86328 (Test for detection of severe acute respiratory syndrome coronavirus 2 (Covid-19) antibody, qualitative or semiquantitative) with diagnosis code Z20.822 billed by GS Labs, LLC for the above listed date of service.
>
> **Appeal Decision**
> After reviewing the appeal, I'm pleased to tell you that coverage for procedure code 86328 performed on April 28, 2021 is approved. These services are covered subject to your benefit plan coverage provisions at the time the service is provided. All the original information in your file, the information submitted with this request and the terms of your benefit plan were reviewed. I've now made the necessary arrangements to reprocess the claim.

179.  Although in this appeal response Cigna overturns the denial of the Covid Testing claim, Cigna nonetheless represents that this Covid Testing will be reimbursed in accordance with the terms of the health plan, and *not* in accordance with the CARES Act or even its own internal reimbursement policies. This violates the requirement of the CARES Act that Covid Testing be reimbursed at the provider's cash posted price.

180.  Example 7 of Cigna's appeal responses is as follows:

> We received claim 8652230703141 for services received between 05/28/2021 – 05/28/2021 from GS LAB. You are receiving this letter because, as noted on your Explanation of Benefits, there is a service we cannot cover under your benefit plan because the treatment is not medically necessary. The dollar amount of the service not covered, the description, and reason why the service is not covered is

**Details about this service**

- The total charges not paid for the service listed below is $979.00.
- Payment was requested for the below service with a primary diagnosis of Z20822 Contact with and (suspected) exposure to COVID19.
- Service: 0202U Infectious disease (bacterial or viral respiratory tract infection), pathogen-specific nucleic acid (DNA or RNA), 22 targets including severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), qualitative RT-PCR, nasopharyngeal swab, each pathogen reported as detected or not detected
- We received the claim on 11/02/2022.
- **We can't pay this service because this service is not medically necessary.**
- Nucleic acid pathogen tests are used to help find the bacteria, virus or **fungus causing an infection. There isn't enough proof** to show testing of genetic material for more than 5 respiratory pathogens improves health **outcomes. That's why it is not medically necessary and your plan doesn't** cover it.
- The requested service(s) do not meet the definition of medical necessity found in your benefit plan.
- We used the Cigna Medical Coverage Policy 0530 Nucleic Acid Pathogen Testing to make this decision. All Cigna Medical Coverage Policies are available online at Cigna.com.

181.  In this appeal response, Cigna is violating Section 6001 of the FFCRA by denying medically appropriate Covid Testing services that should otherwise be covered when determined medically appropriate by an attending healthcare provider.

182.  Example 8 of Cigna's appeal responses is as follows:

Hello Gs,

The claim(s) in question were processed at the appropriate benefit level, but reimbursement may have been impacted by the customer's benefit plan, Cigna reimbursement policies, claim auditing software, vendor discounted/re-priced amounts, and/or the plan deductible and cost share. Prior to considering your request as an appeal, we need more information. Please resubmit with the specific reduction you wish to dispute along with any supporting documentation.

If your request concerns the vendor pricing on this claim, please contact the vendor directly at the number shown on the Cigna EOP.

183.  In this response, Cigna contends that the Covid Testing claim was reimbursed at the appropriate benefit level, but states that the amount may have been affected by several other factors. Never mind Cigna's obligation to comply with the reimbursement requirements of Section 3202(a) of the CARES Act. This appeal

response makes no sense, yet it is a very common appeal response. Additionally, this response does not even comply with the minimum requirements of the ERISA and ACA claims procedures identified above.

184. Example 9 of Cigna's appeal response is as follows:

On July 29, 2022, we received an appeal request concerning our decision to deny the Preventive Lab Age  16 Up to Age 17 OV service provided on November 19, 2021 from GS Labs. We understand that you are asking to allow the service. The claim was billed with diagnosis code Z20.822; service code 8711 (Detection test by immunoassay with direct visual observation for severe acute respiratory syndrome coronavirus 2 (COVID-19)).

**Appeal Decision**
After reviewing the appeal submitted by ▆▆▆▆▆, the original decision to deny the Preventive Lab Age  16 Up to Age 17 OV service provided on November 19, 2021 is upheld. All the original information in your file, the information submitted with this request and the terms of your benefit plan were reviewed.

185. Like the Cigna appeal response above, this Cigna response does not make sense because medically appropriate diagnostic Covid Testing services must be covered for all Cigna Members regardless of age. Additionally, Cigna is violating Section 6001 of the FFCRA in denying medically appropriate Covid Testing services that should otherwise be covered when determined as medically appropriate by an attending healthcare provider.

186. Cigna's internal administrative appeals processes do not factor in or consider the applicable requirements of the FFCRA and the CARES Act.  This confirms Cigna's utter disregard of its obligations to comply with these Congressionally imposed mandates. Cigna represents in its policies that federal and state laws are factored into its review of claims and any applicable laws that conflict with its own policies will supersede its policies. Yet it is clear these factors are ignored at the appeals stage. Indeed, the vast majority of Cigna's responses make no reference or allusion to the FFCRA, the CARES Act, or the public health emergency—and when Cigna does

reference any of these, its statements contradict and conflict with the statutory requirements.

187.  Cigna's conduct has harmed GSL by wrongfully denying GSL reimbursement for services that Cigna was required to pay.  It has also forced GSL to incur needless administrative costs in attempting to recover funds due and payable to GSL under the Cigna Health Plans, including the Cigna ASO Plans.

### 9.  Overpayment Recovery Scheme

188.  The Overpayment Recovery Scheme piggybacks on the Contradictory EOB Scheme and the Repricing Reduction Scheme; hence the facts and examples detailed in the Contradictory EOB Scheme and the Repricing Reduction Scheme are also relevant to this scheme.

189.  Through the Overpayment Recovery Scheme, Cigna conspires with Overpayment Recovery Companies to pay itself, from embezzled and/or converted Cigna ASO Plan trust assets, to recover what Cigna calls "overpaid" amounts.

190.  Even when Cigna reimburses GSL in whole or in part for Covid Testing services, there is no guarantee that Cigna will allow GSL to keep those payments because it often claims that it "overpaid" the claim. Thus, not only does Cigna violate the FFCRA and/or the CARES Act on most of the Covid Testing claims GSL submits on behalf of Cigna Members, but Cigna also shifts 100% of the risk of providing Covid Testing services to GSL because it unilaterally declares many payments as overpayments—so the threat of improper recoupment is ever-present thanks to Cigna's improper Overpayment Recovery Scheme.

191. Additionally, overpayment determinations constitute adverse benefit determinations; therefore, Cigna has an obligation to comply with the notice reasons described in the ERISA and ACA's claims procedure when issuing any overpayment notices to GSL. Yet it has failed to do so.  Not a single overpayment determination letter issued by Cigna or an Overpayment Recovery Company complies with the minimum requirements of the ERISA and ACA's claim procedures in order for GSL to properly appeal and contest the overpayment determination.

192. The following are representative examples of the overpayment notification reasons utilized by Cigna and/or the Overpayment Recovery Company in the notice of overpayment letters mailed to GSL:

193. Examples 1 and 2 of Cigna's overpayment notifications are as follows:

**Re: Overpayment Request**

On October 27, 2021 we issued an electronic payment to Gs Labs for services that were provided on September 14, 2021 for account number 1027845. Our records indicate that we overpaid you for the reason listed below:

We processed this claim using incorrect contracted rates.  A separate Explanation of Benefits will be sent to you showing the adjustment to the claim.

Please remit to us a check for $45.52 made payable to Cigna. Send to the reply address noted above.

**Re: Overpayment Request**

On December 23, 2021 we issued an electronic payment to Gs Labs for services that were provided on December 1, 2021 for account number 1254577.  Our records indicate that we overpaid you for the reason listed below:

Our original calculation of benefits included the incorrect contracted rate for this service.

194. Again, GSL is an OON provider and therefore has no contracted rate. Yet Cigna contends (i) that it initially processed this claim at a "contracted rate," (ii) that this "contracted rate" was wrong, and (iii) that GSL must remit the "overpayment," which appears to have been calculated from a different nonexistent contractual rate.

Both rates are falsely based on contracted rates that have never existed—not on Section 3202(a) of the CARES Act.

195. Example 3 of Cigna's overpayment notifications is as follows:

**Re: Overpayment Request**

On November 3, 2021 we issued an electronic payment to Gs Labs for services that were provided on September 16, 2021 for account number 1058120. Our records indicate that we overpaid you for the reason listed below:

This is an overpayment request due to ClaimsXten code edits previously being applied in error.

Please return a copy of this letter along with a check for $45.52 made payable to Cigna. Send to the reply address noted above.

196. GSL coded and billed clean Covid Testing claims to Cigna in alignment with the coding and billing guidance issued by the Centers for Disease Control (the "CDC"), the American Medical Association (the "AMA"), CMS, and other industry guidance, and in this case any many others, Cigna accepted and covered Covid Testing claims from GSL that were billed in the same or in a substantially similar manner. Additionally, Cigna fails to provide the "coding edits" ClaimsXten recommends—this prevents GSL from effectively contesting and appealing the overpayment determination.

197. Example 4 of Cigna's overpayment notifications is as follows:

Dear GS LABS:

We found that the claim listed below were not paid correctly due to inaccurate information at the time of processing.

198. Again, GSL coded and billed clean Covid Testing claims to Cigna in alignment with the coding and billing guidance issued by the Centers for Disease Control (the "CDC"), the American Medical Association (the "AMA"), CMS, and other industry guidance, and in this case and many others, Cigna accepted and covered Covid

Testing claims from GSL that were billed in the same or in a substantially similar manner. Additionally, Cigna fails to provide the "inaccurate information" provided by GSL at the time of the claims processing and adjudication—this prevents GSL from effectively contesting and appealing the overpayment determination.

199. Example 5 of Cigna's overpayment notifications is as follows:

Dear {recipient}:

We are writing to notify you that we reviewed a claim you submitted for the patient named above and determined that an error resulted in an overpayment to you for $41.38 Because services were not rendered as billed. As a result, you should have received a payment of $0.00.

200. GSL billed Covid Testing claims to Cigna only for Covid Testing services performed on Cigna Members based upon an individualized clinical assessment performed by an attending healthcare provider who determined that a diagnostic Covid Test was medically appropriate based upon the symptoms or conditions presented. Cigna fails to provide any reason why it contends that "services were not rendered as billed"—this prevents GSL from effectively contesting and appealing the overpayment determination.

201. Example 6 of Cigna's overpayment notifications is as follows:

The overpayment identified is for the below customer and correlates to the following claim(s):

| Amount Due: | $338.62 | | |
|---|---|---|---|
| Reason: | reasonable and customary reduction | Other Insurance Information | |
| Customer Name: | ~~Pincers.~~ | Client Group: | EQUITY-LEAGUE HEALTH TRUST FUN |
| Date(s) of Service: | 09/16/2021 | | |
| Total Charges: | $430.00 | | |
| Total Paid: | $380.00 | | |
| Plan Participant: | | | |
| Patient Number: | | | |

202. Cigna initially failed to reimburse this Covid Testing claim in accordance with Section 3202(a) of the CARES Act, and subsequently determines that the

majority of the payments made are subject to a further "reasonable and customary" reduction that again contradicts Cigna's obligation to comply with the FFCRA and the CARES Act. Additionally, it is unclear what the meaning or purpose of this over-payment reason is—this prevents GSL from effectively contesting and appealing the overpayment determination.

203. Example 6 of Cigna's overpayment notifications is as follows:

The overpayment identified is for the below customer and correlates to the following claim(s):

| | |
|---|---|
| Amount Due: | $114.00 |
| Reason: | code editing guidelines |
| Customer Name: | |
| Date(s) of Service: | 11/04/2021 |
| Total Charges: | $430.00 |
| Total Paid: | $114.00 |
| Plan Participant: | |
| Patient Number: | |

204. GSL coded and billed clean Covid Testing claims to Cigna in alignment with the coding and billing guidance issued by the Centers for Disease Control (the "CDC"), the American Medical Association (the "AMA"), CMS, and other industry guidance, and Cigna accepted and covered Covid Testing claims from GSL that were billed in the same or in a substantially similar manner. Additionally, Cigna fails to provide the "code editing guidelines" it recommends—this which prevents GSL from effectively contesting and appealing the overpayment determination.

205. Examples 7 and 8 of Cigna's overpayment notifications is as follows:

The overpayment identified is for the below customer and correlates to the following claim(s):

| | |
|---|---|
| Amount Due: | $82.76 |
| Reason: | incorrect contract rate |
| Customer Name: | |
| Date(s) of Service: | 01/25/2022 |
| Total Charges: | $229.00 |
| Total Paid: | $82.76 |
| Plan Participant: | |
| Patient Number: | |

```
Our Client: CIGNA HEALTHCARE
Amount Due: $208.91
Reason: incorrect contract rate - discount
Customer Name: ███████████
Claim Number: 210426036400
Patient Account Number: █████████
Date(s) of Service: 02/13/2021
Check Number: 753432967
Total Charges: $810.00
Total Paid: $295.52
Plan Participant: ██████████████
```

206. Again, although GSL is an OON provider, Cigna claims that it initially adjudicated this Covid Testing claim using a nonexistent "contract rate." Cigna and/or the Overpayment Recovery Company then appear to apply a new (and equally nonexistent) "contract rate" and expect GSL to pay the difference. Yet Cigna must pay GSL under Section 3202(a) of the CARES Act—not imaginary "contract rates" that an OON provider has never had.

207. Example 9 of Cigna's overpayment notifications is as follows:

```
The overpayment identified is for the below customer and correlates to the following claim(s):

Amount Due:            $114.00
Reason:                paid at per diem rate instead of discount rate
Customer Name:         ███████████
Date(s) of Service:    12/03/2021
Total Charges:         $430.00
Total Paid:            $114.00
Plan Participant:      █████████████
Patient Number:        █████████████
```

208. This overpayment reason includes another admission that Cigna failed to initially adjudicate the Covid Testing claim in compliance with the FFCRA and the CARES Act or even with its own internal policies: Neither the "per diem rate" nor the "discount rate" comply with Cigna's obligations under Section 3202(a) of the CARES Act. To make matters worse, Cigna is attempting to collect the *full amount paid* on

the claim even though the overpayment reason states that it should have been paid at a "discount rate."

209.  Example 10 of Cigna's overpayment notifications is as follows:

**Re: Overpayment Request**

On June 16, 2021 we issued check number 754183744 to Gs Labs for services that were provided on April 15, 2021 for account number 682307.  Our records indicate that we overpaid you for the reason listed below:

These services are not covered under the plan.

The overpayment identified is for the below customer and correlates to the following claim(s):

| | | | |
|---|---|---|---|
| Amount Due: | $124.14 | | |
| Reason: | non-covered treatment/service | Other Insurance Information | |
| Customer Name: | █████████ | Client Group: | TAKE-TWO INTERACTIVE |
| Date(s) of Service: | 12/22/2021 | | SOFTWARE, |
| Total Charges: | $430.00 | | |
| Total Paid: | $124.14 | | |
| Plan Participant: | █████████ | | |
| Patient Number: | █████████ | | |

210.  This overpayment reason contradicts the coverage requirements of Section 6001 of the FFCRA.  That section requires all Covid Testing services be covered by all private health plans. Cigna is attempting to collect payment from GSL for legitimate Covid Testing services rendered even though Cigna failed to initially adjudicate the claim in accordance with the reimbursement requirement of Section 3202(a) of the CARES Act.

211.  When analyzing the overpayment notifications and requests for refunds, it is important to note that the vast majority of Cigna Members' Covid Testing claims were paid using an arbitrarily determined methodology and/or internal policy that does not align with the requirements of Section 3202(a) of the CARES Act. All of the above referenced overpayment reasons conflict with the Congressional methodology

that Cigna must use in determining the proper reimbursements to be paid to GSL during the public health emergency.

212. Regardless, though these Cigna Members' Covid Testing claims were initially paid in part (albeit at incorrect, often arbitrary, and unilaterally determined rates), Cigna is now demanding that GSL refund the full or a substantial amount of payment it received for providing bona fide Covid Testing services for a reason that has no application to how the claims should have been initially processed.

213. Because of this Overpayment Recovery Scheme, GSL has not only been forced to repay amounts that it was entitled to keep, but it faces the perpetual risk that Cigna will wrongfully claw back any reimbursement it makes—therefore, GSL has assumed all the risk of providing Covid Testing services which conflicts with the FFCRA and the CARES Act. The overpayment determinations and attempted recovery of such "overpayments" also constitute coverage violations of the FFCRA and reimbursement violations of the CARES Act which are incorporated into ERISA, the PPACA, and the terms of each of the Cigna Health Plans, including the Cigna ASO Plans.

214. As with the Repricing Reduction Scheme, Cigna has a financial incentive to manufacture or concoct fraudulent reasons to recover purported overpayments because Cigna and any Overpayment Recovery Company conspiring with Cigna to collect "overpaid" amounts are able to pay themselves a bounty through the Overpayment Recovery Scheme.

215.  Through its ASO Agreements, Cigna puts itself in a position where it has complete and unfettered access to each of the Cigna ASO Plans' trust assets, so its only goal is to create an appearance or illusion that any money withdrawn from the Cigna ASO Plans' trust assets, or money purportedly recovered for the benefit of the Cigna ASO Plans, are for legitimate reasons.  It accomplishes this through the Over-payment Recovery Scheme and some of the other related schemes detailed in this complaint.

216.  Cigna's overpayment recovery fee can range from 20% to 40% of the re-turned "Claim Payment Recovery" that Cigna collects from GSL or other OON pro-viders. Cigna is permitted under the ASO agreement with the Cigna ASO Plans to pay itself these "recovery" fees from the Cigna ASO Plan trust assets (to which it has unfettered access):

**Section 11.    Collection of and Liability for Claim Payments Recoveries Not Including Subrogation and Right of Recovery**

A.    Payment Recoveries

The Company shall take appropriate steps as it would for its own business under similar circumstances to collect Claim Payment Recoveries. Company shall also take appropriate steps as it would for its own business under similar circumstances to collect pay for performance payments payable to Client or pay for performance overpayments (collectively "Pay for Performance Recoveries"). The Company shall not be required to initiate court proceedings to recover a Pay for Performance Recovery or a Claim Payment Recovery, but is expressly authorized to take all actions to pursue recovery including retaining counsel, settling and compromising claims, and delegating recovery to a third party vendor to assist it in its collection efforts. For any Pay for Performance Recoveries or Claim Payment Recoveries initially identified by the Company, the Company first attempts to pursue recovery itself. If the Company is unable to recover Pay for Performance Recoveries or Claim Payment Recoveries, it may retain a third party vendor(s) to assist with the recovery. In such instances, the amount to be credited as the returned money will be net of any fees charged by such vendor or counsel. The Company's decision to retain a third party vendor(s) to assist with recovery may be based upon the amount of the Pay for Performance Recoveries or the Claim Payment Recoveries or other factors as determined by Company. The Company currently retains third party vendors to assist with recovery for Pay for Performance Recoveries and Claim Payment Recoveries that are in excess of specified minimum amounts. That threshold may change from time to time, at the Company's sole discretion. For further information on the Company's current practices, please contact your Company account representative.

For any Pay for Performance Recoveries or Claim Payment Recovery amounts that are first identified by a vendor, regardless of the cause, including but not limited to Payments made without regard to other coverage of the Member, if the Company uses the services of a vendor to collect the Pay for Performance Recoveries or Claim Payment Recovery, the Client agrees to reimburse the Company up to 35.4% of the returned Pay for Performance Recoveries or Claim Payment Recovery for collection costs.

217.  Cigna pays a percentage of its 20% to 40% recovery fee to its Overpayment Recovery Companies for their services. The recovery fees paid to Cigna and the Overpayment Recovery Companies are calculated as a percentage of recovery, which provides an incentive for Cigna and the Overpayment Recovery Companies to conspire to recover from GSL as much as they can on a previously covered and previously paid Covid Testing claim to maximize their profits and often pay themselves more than what Cigna actually paid GSL initially and/or after the recovery.

218. Cigna's system of schemes allows Cigna to extract improper bounties twice on a single claim:  First, by taking take a percentage of the "savings" fee through its Repricing Reduction Scheme, and second by claiming an overpayment on the same claim and paying itself a "recovery" fee through its Overpayment Recovery Scheme.

This harms GSL by depriving it of reimbursements that by law GSL is entitled to receive and retain.

219. Cigna's uses of the mails and wires in furtherance of the Overpayment Recovery Scheme has damaged GSL by diverting Cigna ASO Plan trust assets away from GSL to allow Cigna to pay itself and its contracted Overpayment Recovery Companies "recovery fees" on the purported "recoveries" that Cigna has achieved for the Cigna ASO Plans. Cigna's conduct has also forced GSL to incur needless administrative costs in attempting to stop the recovery of funds owed and already paid to GSL under the Cigna Health Plans, including the Cigna ASO Plans.

### E. Cigna Embezzles and Converts Funds from Cigna ASO Plans, in Violation of 18 U.S.C. § 664.

220. Cigna wrongfully profits by (i) improperly retaining and/or recovering—and effectively embezzling and/or converting—Cigna ASO Plans' trust assets that are due and owing to GSL under the terms of the Cigna ASO Plans as required by the FFCRA and the CARES Act; (ii) earning interest on these amounts; and (iii) embezzling and/or converting Cigna ASO Plan trust assets into savings and recovery fees calculated as a percentage of savings or recoveries manufactured under the Repricing Reduction Scheme, the Overpayment Recovery Scheme, and the other various and related schemes.

221. Through this conduct, Cigna has engaged in multiple acts of embezzlement and/or conversion of the Cigna ASO Plan trust assets in violation of 18 U.S.C. § 664.

222. Cigna's conduct directly harms GSL by improperly diverting to itself Cigna ASO Plans' trust assets—assets that are due and payable to GSL; and by forcing GSL to incur unnecessary administrative costs in attempting to recover funds due and payable to GSL under the Cigna ASO Plans.

## F. The Impact of Cigna's Conduct

223. The purpose of this Complaint is not just to detail the lengths to which Cigna has gone to intentionally avoid and circumvent its obligations to comply with the FFCRA and the CARES Act, but also to shed light on how Cigna, together with its co-conspirators, enriches them all by engaging in such fraudulent schemes.

224. Cigna publicly feigns compliance with the FFCRA and the CARES Act as cover for: (i) pushing internal policies and agendas that directly contradict the FFCRA, the CARES Act, and its own public representations; (ii) overwhelming and inundating GSL and other OON providers with inconsistent, conflicting, and contradictory adjustment/reason codes, appeal responses, and overpayment reasons that GSL is forced to address on a claim-by-claim basis thus subjecting GSL to a paperwork war of attrition that Cigna knows the vast majority of OON providers cannot withstand; (iii) administering a sham internal review process that does not even factor or consider applicable federal and state laws and/or terms of health plans that should supersede Cigna's own internal policies or agendas; and (iv) ultimately, allowing it to execute the Repricing Reduction Scheme and the Overpayment Recovery Scheme to embezzle and/or convert Cigna ASO plan trust assets through the fraudulent manufacturing of "savings" and/or "recovery" fees.

225. Cigna's acts in furtherance of its schemes to defraud in violation of 18 U.S.C. §§ 1341 and 1343, and its acts of embezzlement and/or wrongful conversion of the Cigna ASO Plan trust assets in violation of 18 U.S.C. § 664, represent a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

226. Cigna's fraudulent schemes and embezzlement and/or conversion have caused GSL to suffer significant financial harm. In addition to the pecuniary losses described above, GSL has incurred millions of dollars in time, person-hours and other administrative expenses communicating with Cigna, the Repricing Companies, and the Overpayment Recovery Companies both through written and oral means, in attempts to recover proper reimbursements on claims submitted by GSL for the medically appropriate Covid Testing services provided to Cigna Members.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF 18 U.S.C. § 1962(c)

227. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

228. GSL is a "person" within the meaning of 18 U.S.C. § 1961(3).

229. Cigna is a "person" within the meaning of 18 U.S.C. § 1961(3).

230. Each of the Cigna ASO Plans is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Cigna ASO Plans were engaged in activities affecting interstate and foreign commerce at all times relevant to this Original Complaint.

231. Cigna is associated with the Cigna ASO Plans and has conducted or participated, directly or indirectly, in the conduct of the Cigna ASO Plans in relation to GSL through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5).

232. The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5), described more fully above, includes Cigna's multiple, repeated, and continuous uses of the mails and wires in furtherance of distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343. It also includes Cigna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the Cigna ASO Plans subject to ERISA, in violation of 18 U.S.C. § 664.

233. Cigna has also used the wires and mails in furtherance of its schemes to defraud by, among other things, disseminating false and misleading information over the wires (for example, by electronic transmission to the GSL through HIPAA standard transactions for claims submission and processing and through electronic fund transfers), and by mail.

234. Through these schemes, discussed more fully above, Cigna communicates with Cigna ASO Plans, through ASO agreements negotiated through the wires and/or mails, and through its communications in the processing of electronic health care transactions, falsely stating that the claims denied or the amounts underpaid to the GSLs are justified and accurate under the terms of the Cigna ASO Plans or applicable law.

235.  Cigna has engaged in these racketeering activities with the specific intent to defraud, as described in this Complaint, for the purposes of depriving GSL and the Cigna ASO Plans of money and other property.

236.  Cigna has also embezzled or converted Cigna ASO Plan trust assets by, among other things, retaining, earning interest on and earning administrative fees as a percentage of, fraudulently retained or recovered Cigna ASO Plan trust assets that are owed to GSL under the terms of the Cigna ASO Plans.

237.  As a direct result of Cigna's violation of 18 U.S.C. § 1962(c), GSL has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Cigna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Cigna's intentional underpayment of claims submitted for reimbursement for Covid Testing of Cigna Members (iii) lost revenue from Cigna's intentional diversion of Cigna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, person-hours, and other administrative expense incurred because of Cigna's unlawful conduct.

## COUNT II: VIOLATION OF 18 U.S.C. § 1962(d) by CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)

238.  The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

239.  GSL is a "person" within the meaning of 18 U.S.C. § 1961(3).

240.  Cigna is a "person" within the meaning of 18 U.S.C. § 1961(3).

241. Each of the Cigna ASO Plans is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Cigna ASO Plans were engaged in activities affecting interstate and foreign commerce at all times relevant to this Original Complaint.

242. Cigna has conspired with one or more non-party Repricing Companies and/or Overpayment Recovery Companies, within the meaning of 18 U.S.C. § 1962(d), to violate the provisions of 18 U.S.C. § 1962(c).

243. Specifically, Cigna and one or more of the non-party Repricing Companies and/or the Overpayment Recovery Companies each agreed and intended, or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the Cigna ASO Plans through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

244. The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5), described more fully above, includes Cigna's multiple, repeated, and continuous uses of the mails and wires in furtherance of distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343. It also includes Cigna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the Cigna ASO Plans subject to ERISA, in violation of 18 U.S.C. § 664.

245. As described more fully above, Cigna has conspired with one or more of the non-party Repricing Companies and/or the Overpayment Recovery Companies to

engage in these racketeering activities with the specific intent to defraud, described more fully throughout this Complaint.

246. Cigna and the non-party Repricing Companies and/or the Overpayment Recovery Companies have conspired to commit these activities in furtherance of Cigna's schemes to defraud and for the purpose of depriving GSL and the Cigna ASO Plans of money and other property. Cigna has embezzled or converted Cigna ASO Plan trust assets by among other things, retaining, earning interest on and earning administrative fees as a percentage of (net a percentage of savings paid and/or recoveries made to non-party Repricing Companies and/or the Overpayment Repricing Companies), fraudulently retained and/or withheld Cigna ASO Plan trust assets that are owed to GSL for services rendered to Cigna Members of each of the respective Cigna ASO Plans.

247. Cigna has also used the wires and mails in furtherance of its schemes to defraud by, among other things, disseminating false and misleading information over the wires (for example, by electronic transmission to the GSL through HIPAA standard transactions for Covid Testing claims submission and processing and through electronic fund transfers), and by mail.

248. Cigna's activities described herein in furtherance of its conspiracy to violate 18 U.S.C. § 1962(c) separately violate 18 U.S.C. § 1962(d). Cigna's violations of 18 U.S.C. § 1962(d) have likewise obstructed, delayed, or otherwise affected interstate commerce.

249. As a direct result of Cigna's unlawful conspiracy, under 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c), and its unlawful acts of racketeering undertaken in furtherance of the conspiracy, described herein, GSL has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Cigna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Cigna's intentional underpayment of claims submitted for reimbursement for Covid Testing of Cigna Members (iii) lost revenue from Cigna's intentional diversion of Cigna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, person-hours, and other administrative expense incurred because of Cigna's unlawful conduct.

## COUNT III: VIOLATION OF 18 U.S.C. § 1962(a)

250. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

251. GSL is a "person" within the meaning of 18 U.S.C. § 1961(3).

252. Cigna is a "person" within the meaning of 18 U.S.C. § 1961(3).

253. Cigna, the Repricing Companies, and the Overpayment Recovery Companies are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). Cigna, the Repricing Companies, and the Overpayment Recovery Companies were engaged in activities affecting interstate and foreign commerce at all times relevant to this Original Complaint.

254. Cigna has directly and indirectly invested and used the proceeds of its pattern of racketeering activity in the establishment or operation of itself, the

Repricing Companies, and the Overpayment Recovery Companies, in violation of 18 U.S.C. § 1962(a).

255. The pattern of racketeering activity, the proceeds of which were invested in the establishment or operation of these enterprises, includes Cigna's multiple, repeated, and continuous uses of the mails and wires in furtherance of the various but interrelated schemes detailed above, in violation of 18 U.S.C. §§ 1341 and 1343, described more fully above. It also includes Cigna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the Cigna ASO Plan trust assets for those Cigna ASO Plans subject to ERISA, described more fully above, in violation of 18 U.S.C. § 664.

256. Cigna's activities described herein in violation of 18 U.S.C. § 1962(a) have obstructed, delayed, or otherwise affected interstate commerce.

257. Cigna's investment and use of the proceeds of its pattern of racketeering activity in the establishment or operation of itself, the Repricing Companies, and the Overpayment Recovery Companies, in violation 18 U.S.C. § 1962(a), has directly injured GSL. This injury includes diversion of Cigna ASO Plan trust assets otherwise due and payable to GSL away from GSL and into Cigna, its Repricing Companies, and its Overpayment Recovery Companies.

258. Specifically, as detailed more fully above, Cigna manufactures and retains "savings" and "recovery" fees from the Cigna ASO Plans through their misrepresentations and embezzlement and/or conversion of Cigna ASO Plan trust assets. Cigna then invests these "savings" and "recovery" fees into itself and their contracted

Repricing Companies and Overpayment Recovery Companies. Doing so directly harms GSL by obstructing GSL's access to the Cigna ASO Plan trust assets to which GSL is lawfully entitled.

259.  As a direct result of Cigna's violation of 18 U.S.C. § 1962(a), to violate 18 U.S.C. § 1962(c), GSL has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Cigna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Cigna's intentional underpayment of claims submitted for reimbursement for Covid Testing of Cigna Members (iii) lost revenue from Cigna's intentional diversion of Cigna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, person-hours, and other administrative expense incurred because of Cigna's unlawful conduct.

### COUNT IV: VIOLATION OF 18 U.S.C. § 1962(d) – CONSPIRING TO VIOLATE 18 U.S.C. § 1962(a)

260.  The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

261.  GSL is a "person" within the meaning of 18 U.S.C. § 1961(3).

262.  Cigna is a "person" within the meaning of 18 U.S.C. § 1961(3).

263.  Cigna, the Repricing Companies, and the Overpayment Recovery Companies are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). Cigna, the Repricing Companies, and the Overpayment Recovery Companies were engaged in activities affecting interstate and foreign commerce at all times relevant to this Original Complaint.

264. Cigna has conspired with one or more non-party Repricing Companies and Overpayment Recovery Companies, within the meaning of 18 U.S.C. § 1962(d) to violate the provisions of 18 U.S.C. § 1962(a).

265. Specifically, Cigna and one or more of the non-party Repricing Companies and/or Overpayment Recovery Companies each agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: directly or indirectly investing the proceeds of Cigna's pattern of racketeering activity in the establishment or operation of Cigna, the Repricing Companies, and the Overpayment Recovery Companies, in violation of 18 U.S.C. § 1962(a).

266. The pattern of racketeering activity, the proceeds of which were intended to be invested in the establishment or operation of these enterprises, includes Cigna's multiple, repeated, and continuous uses of the mails and wires in furtherance of the various but interrelated schemes detailed above, in violation of 18 U.S.C. §§ 1341 and 1343, described more fully above. It also includes Cigna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the Cigna ASO Plan trust assets for those Cigna ASO Plans subject to ERISA, described more fully above, in violation of 18 U.S.C. § 664.

267. Cigna's activities described herein in furtherance of its conspiracy to violate 18 U.S.C. § 1962(a) have obstructed, delayed, or otherwise affected interstate commerce.

268. Cigna's conspiracy to invest and use the proceeds of its pattern of racketeering activity in the establishment or operation of itself, the Repricing Companies,

and the Overpayment Recovery Companies, in violation 18 U.S.C. § 1962(a), has directly injured GSL. This injury includes diversion of Cigna ASO Plan trust assets otherwise due and payable to GSL away from GSL and into Cigna, its Repricing Companies, and its Overpayment Recovery Companies. Cigna is also able to invest and use the funds so diverted to maintain a robust network of Repricing Companies and Overpayment Recovery Companies and others through which Cigna can continue to inflict harm on GSL, as described more fully above.

269. As a direct result of Cigna's unlawful conspiracy, under 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(a), and its unlawful acts of racketeering undertaken in furtherance of the conspiracy, described herein, GSL has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Cigna's intentional circumvention of the FFCRA and the CARES Act; (ii) lost revenue from Cigna's intentional underpayment of claims submitted for reimbursement for Covid Testing of Cigna Members (iii) lost revenue from Cigna's intentional diversion of Cigna ASO Plan trust assets that are otherwise due and payable to GSL; and (iv) the costs in time, person-hours, and other administrative expense incurred because of Cigna's unlawful conduct.

## COUNT V: COMMON LAW FRAUD and NEGLIGENT MISREPRESENTATION

270. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

271. Fraud occurs when: (1) a representation is made; (2) that the representation was false; (3) that when made, the representation was known to be false or made

recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the GSL should rely upon it; and (5) that the GSL reasonably did so rely; and (6) that he or she suffered damage as a result.

272. Negligent misrepresentation is similar except it involves negligent instead of intentional misrepresentation.

273. Additionally, fraud or negligent misrepresentation can also occur through non-disclosure of material facts when the non-disclosing party has a duty to disclose.

274. As detailed above, Cigna has knowingly publicized several material representations and statements that purport to providers and Cigna members that it will adjudicate Covid Testing claims in accordance with the FFCRA and the CARES Act, and, in the event that its guidelines and policies issued to providers contradict or conflict with these applicable laws, that its guidelines and policies will be superseded by these applicable laws.

275. Additionally, Cigna knowingly or negligently made false representations to GSL in order to: (i) circumvent its obligations to comply with the FFCRA and the CARES Act; (ii) further the various and interrelated schemes detailed above; and (iii) allow it to recover "savings" and "recovery" fees through the Repricing Reduction Scheme and the Overpayment Reduction Scheme.

276. Cigna issues all of these various representations, statements, guidelines, and policies to OON providers, like GSL, with the intention that providers act upon the contents of such representations in furtherance of all of its various and interrelated schemes.

277. GSL relied upon these material representations by agreeing to render Covid Testing services to Cigna Members and billing Covid Testing claims to Cigna on behalf of these Cigna Members with the expectation that Cigna would cover and not deny the thousands of Covid Testing services that it has. Also, in the instances that Covid Testing Services were covered, that GSL would be reimbursed in accordance with Section 3202(a) of the CARES Act.

278. GSL relied upon all the false representations and statements that Cigna made.

279. Moreover, Cigna intentionally concealed material facts from GSL despite having a duty to disclose such facts to GSL, even after GSL's numerous inquiries and requests for details regarding Cigna's conduct and its disregard for the FFCRA and the CARES Act.

280. Additionally, GSL submitted thousands of appeals to Cigna through its internal administrative appeals process, but, despite a duty under 29 CFR § 2560.503-1 and 45 CFR § 147.136 to provide a thorough response that considers and factors in a review and analysis of all appliable laws (e.g. the FFCRA and the CARES Act), Cigna both concealed material facts that were relevant to adjudication of the Covid Testing claims, and when making reference to the public health emergency and the FFCRA/CARES Act, concealed its obligations to comply with these requirements.

281. Based on the above, GSL is entitled to punitive damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just,

due to Cigna's conscious and outrageous disregard of GSL, other similarly situated OON providers, its Cigna ASO Plans, and its Cigna Members.

## COUNT VI: PROMISSORY ESTOPPEL

282.  The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

283.  A claim of promissory estoppel requires a GSL to show: (1) a promise that the promisor should have reasonably expected to induce the GSL's action or forbearance, (2) the promise did in fact induce the GSL's action or forbearance, and (3) injustice can only be avoided by enforcing the promise.

284.  Cigna undertook conduct that conveyed to GSL that coverage for Covid Testing would be afforded to its Cigna Members, but then denied claims, arbitrarily adjudicated claims, and refused to issue proper reimbursements when the Covid Testing claims were submitted by GSL to Cigna on behalf of Cigna Members.

285.  Cigna expected, or reasonably should have expected, that GSL would rely on Cigna's promise of compliance with the FFCRA and the CARES Act, especially given its public statements and publications emphasizing its purported compliance with the aforementioned laws, and that any policies and guidelines implemented by Cigna would be superseded by these applicable laws whenever there was a conflict between its policies/guidelines and applicable law.

286.  Cigna's publicized statements and publications regarding its compliance with the requirements of the FFCRA and the CARES Act, and the adjudication and full payment of GSL's cash price on Covid Testing claims from time-to-time induced

GSL's reasonable reliance on the promise to properly cover and reimburse GSL in accordance with the FFCRA and/or the CARES Act.

287.  GSL detrimentally relied on Cigna's promises to pay by continuing to provide Covid Testing services to Cigna Members. GSL's reliance on the promises caused it to suffer a definite and substantial detriment and has caused it damage.

288.  Injustice can be avoided only by enforcing Cigna's promises to comply with the law.

289.  Based on the above, GSL is entitled to compensatory damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT VII: UNJUST ENRICHMENT

290.  The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

291.  An unjust enrichment occurs when a defendant has received and retained benefits under circumstances that would make it inequitable and unconscionable to permit the defendant to avoid paying for the reasonable value of the benefits it received.

292.  GSL provided bona fide Covid Testing services to Cigna Members of all Cigna Health Plans.

293.  By providing necessary Covid Testing services throughout the course of the COVID-19 public health emergency to Cigna Members, GSL conferred a benefit upon Cigna because GSL's provision of Covid Testing services facilitated Cigna's

obligations to arrange and pay for Covid Testing services for its members. Cigna also benefited from the insurance premiums from members and the compensation from the Cigna ASO Plans to facilitate and cover Covid Testing services. To satisfy its legal obligations, Cigna needed GSL's Covid Testing services. GSL conferred benefits on Cigna by providing such services to Cigna Members.

294. Cigna knew that GSL provided bona fide Covid Testing services to Cigna Members, thereby satisfying Cigna's obligations to its members. Yet at all relevant times, Cigna either denied or underpaid GSL for virtually all of its bona fide Covid Testing services for Cigna Members in violation of the FFCRA and the CARES Act.

295. Cigna voluntarily accepted, retained, enjoyed, or continues to accept, retain, and enjoy the benefits conferred by GSL, with the knowledge that GSL expects to and is entitled to reasonable payment for such Covid Testing services.

296. Despite proper demand being made on Cigna for payment for these services, Cigna has failed to properly cover or reasonably reimburse GSL for the Covid Testing services provided. Cigna has received and retained a benefit and has been unjustly enriched through the use of funds that earned interest or otherwise added to its profits, when said money should have been paid in a timely and appropriate manner to GSL.

297. As a result of Cigna's unjust enrichment, GSL has suffered damages. Based on the above, GSL is entitled to compensatory damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT VIII: BREACH OF IMPLIED CONTRACT

298. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

299. An implied contract arises where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract. The determination of the parties' intent to make a contract is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction. If the parties' conduct is sufficient to show an implied contract, it is just as enforceable as an express contract.

300. There was an implied contract between the parties under which GS Labs agreed to perform Covid Testing services in exchange for payment of its cash posted price or, at least, the usual and customary charge for similar services in the same geographic area.

301. Cigna undertook conduct that conveyed to GSL that coverage for Covid Testing would be afforded to its Cigna Members. Cigna expected, or reasonably should have expected, that GSL would rely on Cigna's promises of compliance with the FFCRA and the CARES Act, especially given its public statements and publications emphasizing its purported compliance with the aforementioned laws, and that any policies and guidelines implemented by Cigna would be superseded by these applicable laws whenever there was a conflict between its policies/guidelines and applicable law.

302. Cigna's publicized statements and publications regarding its compliance with the requirements of the FFCRA and the CARES Act, and the adjudication and full payment of GSL's cash price on Covid Testing claims from time-to-time induced GSL's reasonable reliance on the promise to properly cover and reimburse GSL in accordance with the FFCRA and/or the CARES Act.

303. GS Labs fully performed its end of the parties' agreement by performing thousands of Covid Testing services for Cigna members and beneficiaries.

304. Cigna breached the parties' agreement by denying GS Labs' claims, arbitrarily adjudicating GS Labs' claims, and refusing to issue proper reimbursements to GS Labs when Covid Testing claims were submitted by GSL to Cigna on behalf of Cigna Members.

305. As a proximate cause of Cigna's breach of contract, GS Labs has suffered millions of dollars' worth of damages.

**COUNT IX: VIOLATIONS OF STATE PROMPT-PAYMENT STATUTES**

306. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

307. GSL received samples from patients from all over the country. Many of these patients have fully insured health plans that are regulated by state insurance laws.

308. All states have rules requiring insurers to pay or deny claims within a certain time frame, usually 30, 45, or 60 days. Known as "prompt pay" laws, the state rules resulting from these laws impose a series of requirements and penalties

intended to ensure that health care professionals are paid in a timely fashion. Prompt pay laws often require insurers to pay electronic claims faster than paper claims.[17]

309. A typical prompt-pay law applies to all "clean claims." A clean claim means that the provider used the insurer's paper claim form (usually known as a CMS-1500 form, formally the HCFA-1500 form) or followed the specified electronic billing format, and has completed all the required fields with enough information to allow the insurer to process the claim.

310. Cigna's failure to timely pay GSL's clean claims violates the applicable state prompt-payment statutes. As a result, GSL is entitled to penalties and interest as allowed by state law.

311. By way of example, many of GSL's patients are from Texas and have health plans regulated by the Texas Department of Insurance. The Texas Prompt Payment Act ("TPPA") contains detailed requirements for the proper submission of eligible healthcare claims and their subsequent processing by insurance companies. TEX. INS. CODE § 843.336, *et seq.* The Texas Department of Insurance, as the administrative agency that regulates health insurance companies operating in Texas, implements regulations that further detail the TPPA requirements. 28 TEX. ADMIN. CODE ("TAC") § 21.2801, *et seq.* The TPPA statutory and regulatory requirements are non-waivable. 28 TAC § 21.2817.

312. Under the TPPA, an insurer has 30 days after receipt of an electronic clean claim to take one of the following actions:

---

[17] *See* Appendix A, Prompt-Pay Statutes – 50 States

(1)    Pay the total amount of the clean claim as specified in the contract between the preferred provider and the insurer;

(2)    Deny the clean claim in its entirety after a determination that the insurer is not liable for the clean claim and notify the preferred provider in writing why the clean claim will not be paid;

(3)    Notify the preferred provider in writing that the entire clean claim will be audited and pay 100 percent of the contracted rate on the claim to the preferred provider; or

(4)    Pay the portion of the clean claim for which the insurer acknowledges liability as specified in the contract between the preferred provider and the insurer, and

    a.    deny the remainder of the clean claim after a determination that the insurer is not liable for the remainder of the clean claim and notify the preferred provider in writing why the remainder of the clean claim will not be paid; or

    b.    notify the provider in writing that the remainder of the clean claim will be audited and pay 100 percent of the contracted rate on the unpaid portion of the clean claim to the preferred provider.

28 TAC §§ 21.2802, 21.2807; TEX. INS. CODE §§ 843.338, 843.346. The state's prompt pay deadlines apply to out-of-network claims for emergency care or its attendant episode of care. TEX. INS. CODE §§ 843.351, 1301.069.

313. An insurer that wishes to audit a claim must notify the provider in writing and pay the provider 100% of the applicable rate. 28 TAC §§ 21.2802, 21.2807; TEX. INS. CODE §§ 843.338, 843.346. Under the TPPA audit provisions, the insurer has 180 days to investigate the claim after properly invoking its audit rights. TEX. INS. CODE §§ 843.340. If the insurer determines that no payment is owed, it may recover the overpayment if it timely notifies the provider (within 180 days after the

provider receives payment) of the basis for and specific reasons for the request, and the provider does not timely (within 45 days) make arrangements for repayment. TEX. INS. CODE § 843.350. If the provider disagrees with the insurer's request for recovery, the insurer must give the provider a chance to appeal and may not recoup the over-payment until all appeal rights are exhausted. *Id.* An insurer that fails to provide the requisite notice and payment may not use the statutory audit procedures. 28 TAC § 21.2809(c).

314. In accordance with the TPPA, GSL timely submitted "clean claims" for reimbursement to Cigna in electronic format. An electronic submission is considered a clean claim if "the claim is submitted using the Institutional 837 (ASC X12N 837) format …" and all information included in the claim is "complete, legible, and accurate." TEX. INS. CODE § 843.336(c); 28 TAC § 21.2803(g). To be considered clean, the claim must include all of the required data elements. TEX. INS. CODE § 843.336. GSL submitted the claims in dispute to Cigna electronically using the HCFA 1500 dataset known as the Institutional 837, and per Cigna's direction GSL used Cigna's electronic clearinghouse, which automatically rejects claims unless all of the required fields are populated. GSL submitted "clean" claims as the TPPA defines that term.

315. If an insurer determines that an electronically submitted claim is deficient, it must notify the provider within 30 days of the claim's receipt. 28 TAC § 21.2808. If any claims were not "clean," Cigna failed to notify GSL that they were deficient within the 30-day electronic submission timeline.

316. Once an insurer receives an electronic clean claim from a provider, it has 30 days to decide whether the claim is payable. If the insurer cannot determine whether the claim is payable within that time, the insurer may choose to audit the claim and invoke a 180-day investigatory period. TEX. INS. CODE §§ 843.338, 843.346; 28 TAC §§ 21.2802, 21.2807.

317. The TPPA requires that an insurer notify the provider of its intent to audit claims—and to do so timely. Cigna did not timely invoke its audit rights under the TPPA. It waited months after the claims were already fully adjudicated to issue its refund demand letter to GSL. Cigna also failed to pay GSL 100% of the applicable rate, and thus has no right to invoke the TPPA audit provisions, including the 180-day investigatory period, let alone the right to demand a refund of or unilaterally recoup amounts already paid to GSL months earlier. TEX. INS. CODE § 843.340.

318. Cigna failed to pay claims within the TPPA timelines. Thus, GSL is entitled to damages, penalties, and interest pursuant to TEX. INS. CODE §§ 843.342 and 1301.137 and 28 TAC § 21.2815, together with attorneys' fees and costs under TEX. INS. CODE §§ 843.343, 1301.108 and 28 TAC § 21.2817.

319. TPPA interest continues to accrue daily. Separate from the TPPA interest, GSL is entitled to pre-judgment interest on the amounts owed to it at the maximum rate allowable under the law.

## COUNT X: VIOLATIONS OF STATE UNFAIR COMPETITION/ TRADE PRACTICES STATUTES

320. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

321. GSL received samples from patients from all over the country, including from California. All states have rules prohibiting unfair competition or business practices.[18] For example, the California Unfair Competition statute, as defined under California Business and Professions Code § 17200, prohibits any unlawful, unfair, or fraudulent business act or practice, as well as unfair, deceptive, untrue, or misleading advertising. That statute is designed to encompass a wide range of wrongful business conduct, borrowing violations from other laws and treating them as independently actionable under the Unfair Competition Law (UCL).

322. To establish a claim under the UCL, a plaintiff must demonstrate that the business practice in question falls into one of three categories: unlawful, unfair, or fraudulent. An unlawful practice is one that violates another law, an unfair practice is one where the harm to the victim outweighs any benefits, and a fraudulent practice is one that is likely to deceive the public. The UCL is broad and remedial, intended to protect both consumers and competitors, promoting fair competition in the marketplace.

323. Here, Cigna engaged in unfair, fraudulent, deceptive, and misleading business practices and advertising in California, which caused substantial harm to GSL in that state for which GSL is entitled to recover damages. As detailed above, Cigna has knowingly publicized several material representations and statements that purport to providers and Cigna members that it will adjudicate Covid Testing claims in accordance with the FFCRA and the CARES Act, and, in the event that its

---

[18] *See* Appendix B, Consumer Protection Laws: 50-State Survey.

guidelines and policies issued to providers contradict or conflict with these applicable laws, that its guidelines and policies will be superseded by these applicable laws.

324. Additionally, Cigna knowingly made false representations to GSL in order to: (i) circumvent its obligations to comply with the FFCRA and the CARES Act; (ii) further the various and interrelated schemes detailed above; and (iii) allow it to recover "savings" and "recovery" fees through the Repricing Reduction Scheme and the Overpayment Reduction Scheme.

325. Cigna issues all of these various representations, statements, guidelines, and policies to OON providers, like GSL, with the intention that providers act upon the contents of such representations in furtherance of all of its various and interrelated schemes.

326. GSL relied upon these material representations by agreeing to render Covid Testing services to Cigna Members and billing Covid Testing claims to Cigna on behalf of these Cigna Members with the expectation that Cigna would cover and not deny the thousands of Covid Testing services that it has. Also, in the instances that Covid Testing Services were covered, that GSL would be reimbursed in accordance with Section 3202(a) of the CARES Act.

327. GSL relied upon all the false representations and statements that Cigna made.

328. Moreover, Cigna intentionally concealed material facts from GSL despite having a duty to disclose such facts to GSL, even after GSL's numerous inquiries and

requests for details regarding Cigna's conduct and its disregard for the FFCRA and the CARES Act.

329. Additionally, GSL submitted thousands of appeals to Cigna through its internal administrative appeals process, but, despite a duty under 29 CFR § 2560.503-1 and 45 CFR § 147.136 to provide a thorough response that considers and factors in a review and analysis of all appliable laws (e.g. the FFCRA and the CARES Act), Cigna both concealed material facts that were relevant to adjudication of the Covid Testing claims, and when making reference to the public health emergency and the FFCRA/CARES Act, concealed its obligations to comply with these requirements.

## COUNT XI: DECLARATORY JUDGMENT

330. The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

331. The Federal Declaratory Judgment Act ("DJA") and its California state equivalent confer upon the courts the power to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Courts may enter declaratory judgments that will serve a useful purpose or will terminate the controversy between the parties.

332. Under the DJA and state equivalent, GSL seeks a declaratory judgment that Cigna's refund demand to GSL is improper and that Cigna is not entitled to any refunds. There is a justiciable controversy regarding the purported bases and methodology of Cigna's refund demand, and the requested declarations will provide the

parties with needed clarity and certainty concerning those rights.  Thus, the re-quested declaratory relief is appropriate.

## COUNT XII: FRAUD and NEGLIGENT MISREPRESENTATION OF ITS AGENT (against Cigna ASO Plans)

333.  The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

334.    There is a principal-agency relationship between the Cigna ASO Plans and Cigna as the plans' third-party claims administrator. Employers who offer healthcare coverage through a self-funded health plan designate a person or entity in their plan document and or their IRS Form 5500s as the plan administrator.  A plan administrator establishes and/or maintains the group health plan and provides medical coverage for participants and/or their dependents directly or through ways such as insurance and reimbursement.

335. A plan administrator's responsibility is to handle the administrative tasks that accompany providing insurance coverage such as: (i) establishing and designing group health plans and plan benefits; (ii) enrolling employees and covered dependents into the health plan; (iii) coordinating with healthcare providers; (iv) issuing plan documents and ID cards; and (v) collecting premium payments/contributions from those employees that have enrolled themselves and/or their covered dependents into health plan.  A plan administrator is responsible for providing the aforementioned services and fulfilling these obligations to enrolled health plan members.  Here, the Cigna ASO Plans are responsible for providing these

services and fulfilling these obligations to their members whose Covid Testing claims are at issue in this lawsuit.

336.  Because the responsibilities required of a plan administrator are usually beyond a plan administrator's expertise, many plan administrators contract with third-party claims administrators, like Cigna, and designate them to perform these services on their behalf.  Third-party claims administrators provide, among other things, administrative services for self-funded health plans as well as allow enrollees in the health plans access to their healthcare networks and contracted rates.

337. The Cigna ASO Plans engaged Cigna as their third-party claims administrator and agent, to provide administrative services on behalf of their members and beneficiaries.

338.  A typical Cigna master services agreement with a self-funded health plan like the Cigna ASO Plans states the plan responsibilities delegated to Cigna by the plan administrator.  The agreement details the services to be offered, the timeframe in which they will be offered, and the standard of care to be exercised as well as other details.  Cigna agrees to the handling of these services by performing the responsibility of a claims administrator of the plan administrator, such as issuing plan documents and ID cards and processing/adjudicating claims.

339.  Typically, the customer (in this case the Cigna ASO Plans) retains complete authority and responsibility for its plan, its operation, and the benefits provided thereunder.  In other words, the Cigna ASO Plans are ultimately

responsible for the acts or omissions of Cigna as they relate to administration of their health plan.

340.  As an authorized agent for the Cigna ASO Plans, Cigna, (i) intentionally or negligently misrepresented to providers, like GSL, and Cigna members, that its adjudications methods for Covid Testing Claims complied with the FFCRA and the CARES Act; and (ii) engaged in fraudulent conduct to continuously misinform GSL of Cigna's obligations to comply with the FFCRA and CARES Act; and (iii) withheld material information that Cigna had a duty to disclose. The Cigna ASO Plans are liable for their agent Cigna's fraudulent representations and actions to GSL.

341.  The Cigna ASO Plans knew or should have known of the falsity of Cigna's representations to providers like GSL that it complies with the FFCRA and CARES act in adjudicating Covid Testing Claims, and that providers like GSL would rely on such representations in deciding whether to perform services for their members and beneficiaries.

342.  GSL has suffered substantial damages as a result of Cigna's fraud, for which the Cigna ASO Plans are ultimately responsible.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, GSL hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, GSL demands judgment in its favor against Defendants as follows:

A.  Awarding injunctive and declaratory relief to prevent Cigna's continuing actions detailed herein that are unauthorized and prohibited by the Cigna Health Plans, including the Cigna ASO Plans, and applicable law;

B.  Compensatory and consequential damages resulting from injury to GSL's businesses and property by reason of Cigna's violations of 18 U.S.C. § 1962, as set forth above and to be further established at trial, subject to trebling under 18 U.S.C. § 1964(c);

C.  Treble and exemplary damages due to Cigna's RICO violations, fraud, and violations of state unfair competition and deceptive business practices statutes;

D.  Prompt-payment penalties and interest under state prompt-payment statutes;

E.  Appointing an independent fiduciary at Cigna's expense to re-adjudicate all of GSL's Covid Testing claims initially processed by Cigna, and to reimburse GSL all amounts Cigna and the Cigna ASO Plans were required to reimburse GSL pursuant to the FFCRA, the CARES Act, ERISA, the ACA, and the terms of the Cigna Health Plans;

F.  Ordering Cigna to pay all reasonable costs and expenses of the independent fiduciary in re-adjudicating the Covid Testing claims and the reasonable costs and expenses associated with correcting all improperly adjudicated Covid Testing claims;

G.  Awarding lost profits and compensatory damages in such amounts as the proofs at trial shall show;

H.  Awarding restitution for payments improperly withheld by Cigna;

I.   Awarding reasonable attorneys' fees, as provided by common law, federal or state statute, or equity, including 18 U.S.C. § 1964(c);

J.   Awarding costs of suit;

K.   Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or rule, or equity; and

L.   Awarding all other relief to which GSL is entitled.

Respectfully submitted,

**NICHOLS BRAR WEITZNER & THOMAS LLP**

<u>/s/ Scott Nichols</u>
Scott Nichols
California Bar No. 224257
(281) 727-8442
snichols@nicholsbrar.com
Zachary W. Thomas
California Bar No. 298174
(832) 316-2535
zthomas@nicholsbrar.com
2402 Dunlavy Street
Houston, Texas 77006

***Attorneys for Plaintiff GS Labs, LLC***